# PATSY *v.* BOARD OF REGENTS OF THE STATE OF FLORIDA

No. 80–1874.   Argued March 2, 1982—Decided June 21, 1982

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and in all but Part III–B of which WHITE, J., joined. O'CONNOR, J., filed a concurring opinion, in which REHNQUIST, J., joined, *post*, p. 516. WHITE, J., filed an opinion concurring in part, *post*, p. 517. POWELL, J., filed a dissenting opinion, in Part II of which BURGER, C. J., joined, *post*, p. 519.

*Charles S. Sims* argued the cause for petitioner. With him on the briefs were *Bruce J. Ennis, Jr., E. Richard Larson, Steven R. Shapiro,* and *Joel M. Gora.*

*Mitchell D. Franks* argued the cause for respondent. With him on the brief was *Jeffrey H. Klink.*\*

---

*Briefs of *amici curiae* urging reversal were filed by *Jack Greenberg, James M. Nabrit III, Bill Lann Lee,* and *Eric Schnapper* for the NAACP Legal Defense and Educational Fund, Inc.; and by *Ellen Josephson* and *Steven H. Steinglass* for the National Legal Aid and Defender Association.

Briefs of *amici curiae* urging affirmance were filed by *Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak* for Americans for Effective Law Enforcement, Inc.; and by *John C. Ross, Jr.,* for the Texas Municipal League et al.

Briefs of *amici curiae* were filed for the State of Washington et al. by *Kenneth O. Eikenberry,* Attorney General of Washington, *Malachy R. Murphy,* Deputy Attorney General, and *Thomas R. Bjorgen,* Assistant Attorney General, and the Attorneys General for their respective States or jurisdictions as follows: *Aviata F. Faalevad* of American Samoa, *Charles A. Graddick* of Alabama, *Wilson L. Condon* of Alaska, *Robert Corbin* of Arizona, *Michael J. Bowers* of Georgia, *Tany S. Hong* of Hawaii, *David H. Leroy* of Idaho, *Tyrone C. Fahner* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *Steven L. Beshear* of Kentucky, *William J. Guste, Jr.,* of Louisiana, *Frank J. Kelley* of Michigan, *Warren R. Spannaus* of Minnesota, *William A. Allain* of Mississippi, *John D. Ashcroft* of Missouri, *Michael T. Greely* of Montana, *Paul L. Douglas* of Nebraska, *Richard H. Bryan* of Nevada, *Gregory H. Smith* of New Hampshire, *James R. Zazzali* of New Jersey, *Rufus L. Edmisten* of North Carolina, *Robert O. Wefald* of North Dakota, *William J. Brown* of Ohio, *LeRoy S. Zimmerman* of Pennsylvania, *Dennis J. Roberts II* of Rhode Island, *Daniel R. McLeod* of South Carolina, *Mark White* of Texas, *David L. Wilkinson* of Utah, *John J. Easton, Jr.,* of Vermont, *Chauncey H. Browning, Jr.,* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Steven F. Freudenthal* of Wyoming; and for the National Education Association et al. by *Michael H. Gottesman, Robert M. Weinberg, Jeremiah A. Collins, Richard C. Dinkelspiel, William L. Robinson,* and *Norman J. Chachkin.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the question whether exhaustion of state administrative remedies is a prerequisite to an action under 42 U. S. C. § 1983 (1976 ed., Supp. IV). Petitioner Georgia Patsy filed this action, alleging that her employer, Florida International University (FIU), had denied her employment opportunities solely on the basis of her race and sex. By a divided vote, the United States Court of Appeals for the Fifth Circuit found that petitioner was required to exhaust "adequate and appropriate" administrative remedies, and remanded the case to the District Court to consider the adequacy of the administrative procedures. *Patsy* v. *Florida International University*, 634 F. 2d 900 (1981) (en banc). We granted certiorari, 454 U. S. 813, and reverse the decision of the Court of Appeals.

## I

Petitioner alleges that even though she is well qualified and has received uniformly excellent performance evaluations from her supervisors, she has been rejected for more than 13 positions at FIU.[1] She further claims that FIU has unlawfully filled positions through intentional discrimination on the basis of race and sex. She seeks declaratory and injunctive relief or, in the alternative, damages.[2]

---

[1] Because this case is here on a motion to dismiss, we accept as true the factual allegations in petitioner's amended complaint. In her initial complaint, petitioner named FIU as the defendant. Relying on *Byron* v. *University of Florida*, 403 F. Supp. 49 (ND Fla. 1975), the District Court granted FIU's motion to dismiss, holding that the Board of Regents and not the individual university had the capacity to sue and be sued under Florida law. The District Court granted petitioner leave to amend, and she amended her complaint to name the Board of Regents "on behalf of" FIU.

[2] Petitioner requested the District Court to "[r]equire Defendants to remedy the discrimination practiced upon Plaintiff by promoting her to the next available position consistent with those previously applied for and for

The United States District Court for the Southern District of Florida granted respondent Board of Regents' motion to dismiss because petitioner had not exhausted available administrative remedies. On appeal, a panel of the Court of Appeals reversed, and remanded the case for further proceedings. *Patsy* v. *Florida International University*, 612 F. 2d 946 (1980). The full court then granted respondent's petition for rehearing and vacated the panel decision.

The Court of Appeals reviewed numerous opinions of this Court holding that exhaustion of administrative remedies was not required, and concluded that these cases did not preclude the application of a "flexible" exhaustion rule. 634 F. 2d, at 908. After canvassing the policy arguments in favor of an exhaustion requirement, the Court of Appeals decided that a § 1983 plaintiff could be required to exhaust administrative remedies if the following minimum conditions are met: (1) an orderly system of review or appeal is provided by statute or agency rule; (2) the agency can grant relief more or less commensurate with the claim; (3) relief is available within a reasonable period of time; (4) the procedures are fair, are not unduly burdensome, and are not used to harass or discourage those with legitimate claims; and (5) interim relief is available, in appropriate cases, to prevent irreparable injury and to preserve the plaintiff's rights during the administrative process. Where these minimum standards are met, a court must further consider the particular administrative scheme, the nature of the plaintiff's interest, and the values served by the exhaustion doctrine in order to determine whether exhaustion should be required. *Id.*, at 912–913. The Court of Appeals remanded the case to the

which she is qualified or in the alternative, to require the Defendants to pay to the Plaintiff the sum of $500,000 as actual and exemplary damages." Record 47. Petitioner also requested that the District Court "order further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of discrimination complained of herein." *Id.*, at 48.

District Court to determine whether exhaustion would be appropriate in this case.

## II

The question whether exhaustion of administrative remedies should ever be required in a § 1983 action has prompted vigorous debate and disagreement. See, *e. g.*, Turner, When Prisoners Sue: A Study of Prisoner Section 1983 Cases in the Federal Courts, 92 Harv. L. Rev. 610 (1979); Note, 8 Ind. L. Rev. 565 (1975); Comment, 41 U. Chi. L. Rev. 537 (1974). Our resolution of this issue, however, is made much easier because we are not writing on a clean slate. This Court has addressed this issue, as well as related issues, on several prior occasions.

Respondent suggests that our prior precedents do not control our decision today, arguing that these cases can be distinguished on their facts or that this Court did not "fully" consider the question whether exhaustion should be required. This contention need not detain us long. Beginning with *McNeese* v. *Board of Education*, 373 U. S. 668, 671–673 (1963), we have on numerous occasions rejected the argument that a § 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies. See *Barry* v. *Barchi*, 443 U. S. 55, 63, n. 10 (1979); *Gibson* v. *Berryhill*, 411 U. S. 564, 574 (1973); *Carter* v. *Stanton*, 405 U. S. 669, 671 (1972); *Wilwording* v. *Swenson*, 404 U. S. 249, 251 (1971); *Houghton* v. *Shafer*, 392 U. S. 639, 640 (1968); *King* v. *Smith*, 392 U. S. 309, 312, n. 4 (1968); *Damico* v. *California*, 389 U. S. 416 (1967). Cf. *Steffel* v. *Thompson*, 415 U. S. 452, 472–473 (1974) ("When federal claims are premised on [§ 1983]—as they are here—we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights"). Respondent may be correct in arguing that several of these decisions could have been based on traditional exceptions to the exhaustion doctrine. Nevertheless, this Court has stated

categorically that exhaustion is not a prerequisite to an action under § 1983, and we have not deviated from that position in the 19 years since *McNeese*.  Therefore, we do not address the question presented in this case as one of first impression.

### III

Respondent argues that we should reconsider these decisions and adopt the Court of Appeals' exhaustion rule, which was based on *McKart* v. *United States*, 395 U. S. 185 (1969). This Court has never announced a definitive formula for determining whether prior decisions should be overruled or reconsidered.  However, in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 695–701 (1978), we articulated four factors that should be considered.  Two of these factors—whether the decisions in question misconstrued the meaning of the statute as revealed in its legislative history and whether overruling these decisions would be inconsistent with more recent expressions of congressional intent—are particularly relevant to our decision today.[3]  Both concern legislative purpose, which is of paramount importance in the exhaustion context because Congress is vested with the power to prescribe the basic procedural scheme under which claims may be heard in federal courts.  Of course, courts play an important role in determining the limits of an exhaustion requirement and may impose such a requirement even where Congress has not expressly so provided.  However, the initial question whether exhaustion is required should be answered by reference to congressional intent; and a court

---

[3] The other factors discussed in *Monell*—whether the decisions in question constituted a departure from prior decisions and whether overruling these decisions would frustrate legitimate reliance on their holdings—do not support overruling these decisions.  *McNeese* was not a departure from prior decisions—this Court had not previously addressed the application of the exhaustion rule to § 1983 actions.  Overruling these decisions might injure those § 1983 plaintiffs who had forgone or waived their state administrative remedies in reliance on these decisions.

should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent.[4] Therefore, in deciding whether we should reconsider our prior decisions and require exhaustion of state administrative remedies, we look to congressional intent as reflected in the legislative history of the predecessor to § 1983 and in recent congressional activity in this area.

## A

In determining whether our prior decisions misconstrued the meaning of § 1983, we begin with a review of the legislative history to § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to § 1983.[5] Although we recognize that the 1871 Congress did not expressly contemplate the exhaustion question, we believe that the tenor of the debates over § 1 supports our conclusion that exhaustion of administrative remedies in § 1983 actions should not be judicially imposed.

---

[4] Congressional intent is important in determining the application of the exhaustion doctrine to cases in which federal administrative remedies are available, as well as to those in which state remedies are available. Of course, exhaustion is required where Congress provides that certain administrative remedies shall be exclusive. See *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41 (1938). Even where the statutory requirement of exhaustion is not explicit, courts are guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme. In determining whether exhaustion of federal administrative remedies is required, courts generally focus on the role Congress has assigned to the relevant federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created by Congress. See *McKart* v. *United States*, 395 U. S. 185, 193–195 (1969). With state administrative remedies, the focus is not so much on the role assigned to the state agency, but the role of the state agency becomes important once a court finds that deferring its exercise of jurisdiction is consistent with statutory intent.

[5] Some of the debates relating to § 2, which created certain federal crimes in addition to those defined in § 2 of the 1866 Civil Rights Act, 14 Stat. 27, aimed primarily at the Ku Klux Klan, are also relevant to our discussion of § 1.

The Civil Rights Act of 1871, along with the Fourteenth Amendment it was enacted to enforce, were crucial ingredients in the basic alteration of our federal system accomplished during the Reconstruction Era. During that time, the Federal Government was clearly established as a guarantor of the basic federal rights of individuals against incursions by state power. As we recognized in *Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972) (quoting *Ex parte Virginia*, 100 U. S. 339, 346 (1880)), "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'"

At least three recurring themes in the debates over § 1 cast serious doubt on the suggestion that requiring exhaustion of state administrative remedies would be consistent with the intent of the 1871 Congress. First, in passing § 1, Congress assigned to the federal courts a paramount role in protecting constitutional rights. Representative Dawes expressed this view as follows:

> "The first remedy proposed by this bill is a resort to the courts of the United States. Is that a proper place in which to find redress for any such wrongs? If there be power to call into courts of the United States an offender against these rights, privileges, and immunities, and hold him to an account there, either civilly or criminally, for their infringement, I submit to the calm and candid judgment of every member of this House that there is no tribunal so fitted, where equal and exact justice would be more likely to be meted out in temper, in moderation, in severity, if need be, but always according to the law and the fact, as that great tribunal of the Constitution." Cong. Globe, 42d Cong., 1st Sess., 476 (1871) (hereinafter Globe).

See also *id.*, at 332 (remarks of Rep. Hoar); *id.*, at 375 (remarks of Rep. Lowe); *id.*, at 448–449 (remarks of Rep. Butler); *id.*, at 459 (remarks of Rep. Coburn).[6]

The 1871 Congress intended § 1 to "throw open the doors of the United States courts" to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, *id.*, at 376 (remarks of Rep. Lowe), and to provide these individuals immediate access to the federal courts notwithstanding any provision of state law to the contrary. For example, Senator Edmunds, who introduced the bill in the Senate, stated in his closing remarks that the bill was similar in principle to an earlier act upheld by this Court in *Prigg* v. *Pennsylvania*, 16 Pet. 539 (1842):

> "[T]he Supreme Court decided . . . that it was the solemn duty of Congress under the Constitution to secure to the individual, in spite of the State, or with its aid, as the case might be, precisely the rights that the Constitution gave him, and that *there should be no intermediate authority to arrest or oppose the direct performance of this duty by Congress.*" Globe 692 (emphasis added).

Similarly, Representative Elliott viewed the issue as whether "the Government of the United States [has] the right, under the Constitution, to protect a citizen in the exercise of his vested rights as an American citizen by . . . *the assertion of immediate jurisdiction through its courts,* without the appeal or agency of the State in which the citizen is domi-

---

[6] Opponents of the bill also recognized this purpose and complained that the bill would usurp the States' power, centralize the government, and perhaps ultimately destroy the States. See, *e. g.*, Globe 337, 338 (remarks of Rep. Whitthorne); *id.*, at 352 (remarks of Rep. Beck); *id.*, at 361 (remarks of Rep. Swann); *id.*, at 365 (remarks of Rep. Arthur); *id.*, at 385 (remarks of Rep. Lewis); *id.*, at 429, 431 (remarks of Rep. McHenry); *id.*, at 454 (remarks of Rep. Cox); *id.*, at 510, 511 (remarks of Rep. Eldridge); Cong. Globe, 42d Cong., 1st Sess., App. 46 (1871) (remarks of Rep. Kerr) (hereinafter Globe App.); *id.*, at 216 (remarks of Sen. Thurman); *id.*, at 243 (remarks of Sen. Bayard).

ciled." *Id.*, at 389 (emphasis added). See, *e. g.*, *id.*, at 459 (remarks of Rep. Coburn); *id.*, at 807 (remarks of Rep. Garfield); *id.*, at 609 (remarks of Sen. Pool); Globe App. 141 (remarks of Rep. Shanks).[7]

A second theme in the debates further suggests that the 1871 Congress would not have wanted to impose an exhaustion requirement. A major factor motivating the expansion of federal jurisdiction through §§ 1 and 2 of the bill was the belief of the 1871 Congress that the state authorities had been unable or unwilling to protect the constitutional rights of individuals or to punish those who violated these rights. See, *e. g.*, Globe 321 (remarks of Rep. Stoughton) ("The State authorities and local courts are unable or unwilling to check the evil or punish the criminals"); *id.*, at 374 (remarks of Rep. Lowe) ("the local administrations have been found inadequate or unwilling to apply the proper corrective"); *id.*, at 459 (remarks of Rep. Coburn); *id.*, at 609 (remarks of Sen. Pool); *id.*, at 687 (remarks of Sen. Shurz); *id.*, at 691 (remarks of Sen. Edmunds); Globe App. 185 (remarks of Rep. Platt).[8]

---

[7] Opponents criticized this provision on this very ground. For example, Representative Storm lamented:

"[Section one] does not even give the State courts a chance to try questions, or to show whether they will try the questions that might come before them under the first section of the fourteenth amendment, fairly or not. It takes the whole question away from them in the beginning." *Id.*, at 86.

See also Globe 416 (remarks of Rep. Biggs) ("for the violation of the rights, privileges, and immunities of the citizen a civil remedy is to be had by proceedings in the Federal courts, State authorization in the premises to the contrary notwithstanding"); *id.*, at 337 (remarks of Rep. Whitthorne); *id.*, at 373 (remarks of Rep. Archer); Globe App. 216 (remarks of Sen. Thurman).

[8] This view was expressed in the Presidential message urging the passing of corrective legislation. See Globe 244 ("That the power to correct these evils is beyond the control of State authorities I do not doubt") (message of President Grant). The inability of state authorities to protect constitutional rights was also expressed in the findings of the House Judiciary Committee, which had been directed to investigate the situation. See

Of primary importance to the exhaustion question was the mistrust that the 1871 Congress held for the factfinding processes of state institutions. See, *e. g.,* Globe 320 (testimony of Hon. Thomas Settle, Justice of the North Carolina Supreme Court, before the House Judiciary Committee) ("The defect lies not so much with the courts as with the juries"); *id.,* at 394 (remarks of Rep. Rainey); Globe App. 311 (remarks of Rep. Maynard). This Congress believed that federal courts would be less susceptible to local prejudice and to the existing defects in the factfinding processes of the state courts. See, *e. g.,* Globe 322 (remarks of Rep. Stoughton); *id.,* at 459 (remarks of Rep. Coburn).[9] This perceived defect in the States' factfinding processes is particularly relevant to the question of exhaustion of administrative remedies: exhaustion rules are often applied in deference to the superior factfinding ability of the relevant administrative agency. See, *e. g., McKart* v. *United States,* 395 U. S., at 192–196.

A third feature of the debates relevant to the exhaustion question is the fact that many legislators interpreted the bill to provide dual or concurrent forums in the state and federal system, enabling the plaintiff to choose the forum in which to seek relief. Cf. *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked"). For example, Senator Thurman noted:

> "I object to [§ 1], first, because of the centralizing tendency of transferring all mere private suits, as well as

*id.,* at 320. The resolution introduced by Senator Sherman instructing the Senate Judiciary Committee to report a bill expressed a similar view. See Globe App. 210 (state "courts are rendered utterly powerless by organized perjury to punish crime").

[9] Opponents viewed the bill as a declaration of mistrust for state tribunals. See, *e. g.,* Globe 361 (remarks of Rep. Swann); *id.,* at 397 (remarks of Rep. Rice); *id.,* at 454 (remarks of Rep. Cox); Globe App. 216 (remarks of Sen. Thurman). Representative McHenry found particularly offensive the removal of the factfinding function from the local institutions. See Globe 429.

the punishment of offenses, from the State into the Federal courts. I do not say that this section gives to the Federal courts exclusive jurisdiction. I do not suppose that it is so understood. It leaves it, I presume, in the option of the person who imagines himself to be injured to sue in the State court or in the Federal court, an option that he who has been the least injured, but who has some malice to gratify, will be the most likely to avail himself of." Globe App. 216.

See also Globe 578, 694–695 (remarks of Sen. Edmunds); *id.*, at 334 (remarks of Rep. Hoar); *id.*, at 514 (remarks of Rep. Farnworth); Globe App. 85 (remarks of Rep. Bingham) ("Admitting that the States have concurrent power to enforce the Constitution of the United States within their respective limits, must we wait for their action?").

This legislative history supports the conclusion that our prior decisions, holding that exhaustion of state administrative remedies is not a prerequisite to an action under § 1983, did not misperceive the statutory intent: it seems fair to infer that the 1871 Congress did not intend that an individual be compelled in every case to exhaust state administrative remedies before filing an action under § 1 of the Civil Rights Act. We recognize, however, that drawing such a conclusion from this history alone is somewhat precarious: the 1871 Congress was not presented with the question of exhaustion of administrative remedies, nor was it aware of the potential role of state administrative agencies. Therefore, we do not rely exclusively on this legislative history in deciding the question presented here. Congress addressed the question of exhaustion under § 1983 when it recently enacted 42 U. S. C. § 1997e (1976 ed., Supp. IV). The legislative history of § 1997e provides strong evidence of congressional intent on this issue.

B

The Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV), was enacted pri-

marily to ensure that the United States Attorney General has "legal standing to enforce existing constitutional rights and Federal statutory rights of institutionalized persons." H. R. Conf. Rep. No. 96–897, p. 9 (1980) (Conf. Rep.). In § 1997e, Congress also created a specific, limited exhaustion requirement for adult prisoners bringing actions pursuant to § 1983. Section 1997e and its legislative history demonstrate that Congress understood that exhaustion is not generally required in § 1983 actions, and that it decided to carve out only a narrow exception to this rule. A judicially imposed exhaustion requirement would be inconsistent with Cong.ess' decision to adopt § 1997e and would usurp policy judgments that Congress has reserved for itself.

In considering whether an exhaustion requirement should be incorporated into the bill, Congress clearly expressed its belief that a decision to require exhaustion for certain § 1983 actions would work a change in the law. Witnesses testifying before the Subcommittee that drafted the bill discussed the decisions of this Court holding that exhaustion was not required. See, e. g., Hearings on H. R. 2439 and H. R. 5791 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 95th Cong., 1st Sess., 20 (1977) (1977 Hearings); id., at 47, 69, 77, 323; Hearings on H. R. 10 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 96th Cong., 1st Sess., 48 (1979) (1979 Hearings). During these hearings, Representative Kastenmeier, Chairman of this Subcommittee, stated:

> "Another thing that I think requires some discussion within the committee, and is a point of argument, . . . is whether there ought to be an exhaustion of remedies requirement.
>
> ". . . In fact, I think it has been pointed out that if [we] were to require it, particularly in 1983, that would constitute regression from the current state of the law. It would set the law back, because presently it is clearly

held, that is the Supreme Court has held, that in 1983
civil rights suits the litigant need not necessarily fully
exhaust State remedies." 1977 Hearings 57–58.

See also *id.*, at 272 (remarks of Rep. Drinan) (Representative
Railsback "grounds his bill on doing something which the Su-
preme Court has consistently refused to do, namely require
exhaustion of remedies"); 1979 Hearings 26 (remarks of Rep.
Kastenmeier) (adopting § 1997e "was resisted as a possible
encroachment on civil liberties; that is to say, in the free, un-
impeded resort to 1983").

The debates over adopting an exhaustion requirement also
reflect this understanding. See, *e. g.*, 124 Cong. Rec. 11988
(1978) (remarks of Rep. Volkmer and Rep. Kastenmeier);
*id.*, at 15445 (remarks of Rep. Ertel); *id.*, at 23180 (remarks
of Rep. Wiggins) ("it is settled law that an exhaustion of
administrative remedies is not required as a precondition
of maintaining a 1983 action"); 125 Cong. Rec. 12496 (1979)
(remarks of Rep. Butler) ("Under existing law there is no
requirement that a complainant first ask the State prison
system to help him"). With the understanding that exhaus-
tion generally is not required, Congress decided to adopt
the limited exhaustion requirement of § 1997e in order to re-
lieve the burden on the federal courts by diverting certain
prisoner petitions back through state and local institutions,
and also to encourage the States to develop appropriate
grievance procedures. See, *e. g.*, Conf. Rep. 9; 124 Cong.
Rec. 11976 (1978) (remarks of Rep. Kastenmeier); *id.*, at
11976, 11983 (remarks of Rep. Railsback); *id.*, at 15442 (re-
marks of Rep. Kastenmeier); *id.*, at 15445 (remarks of Rep.
Ertel); *id.*, at 23176 (remarks of Rep. Kastenmeier); *id.*, at
23179–23180 (remarks of Rep. Butler); *id.*, at 23180 (remarks
of Rep. Ertel). Implicit in this decision is Congress' conclu-
sion that the no-exhaustion rule should be left standing with
respect to other § 1983 suits.

A judicially imposed exhaustion requirement would also
be inconsistent with the extraordinarily detailed exhaustion

scheme embodied in § 1997e. Section 1997e carves out a narrow exception to the general no-exhaustion rule to govern certain prisoner claims, and establishes a procedure to ensure that the administrative remedies are adequate and effective. The exhaustion requirement is expressly limited to § 1983 actions brought by an adult convicted of a crime. 42 U. S. C. § 1997e(a)(1) (1976 ed., Supp. IV).[10] Section 1997e(b)(1) instructs the Attorney General to "promulgate minimum standards for the development and implementation of a plain, speedy, and effective system" of administrative remedies, and § 1997e(b)(2) specifies certain minimum standards that must be included.[11] A court may require exhaustion of administrative remedies only if "the Attorney General has certified or the court has determined that such administrative

---

[10] Representative Kastenmeier explains why juveniles were not included in § 1997e:

"I think very candidly we should admit that the first reluctance to resort to this mechanism embodied in [§ 1997e] was resisted as a possible encroachment on civil liberties; that is to say, in the free, unimpeded resort to 1983; because it does deflect 1983 petitions back into—temporarily in any event— back into the State system. Therefore, to the extent that it is even so viewed, notwithstanding the limited form of [§ 1997e], that it should also extend to juveniles was rejected." 1979 Hearings 26.

[11] Section 1997e(b)(2) states:

"The minimum standards shall provide—

"(A) for an advisory role for employees and inmates of any jail, prison, or other correctional institution (at the most decentralized level as is reasonably possible), in the formulation, implementation, and operation of the system;

"(B) specific maximum time limits for written replies to grievances with reasons thereto at each decision level within the system;

"(C) for priority processing of grievances which are of an emergency nature, including matters in which delay would subject the grievant to substantial risk of personal injury or other damages;

"(D) for safeguards to avoid reprisals against any grievant or participant in the resolution of a grievance; and

"(E) for independent review of the disposition of grievances, including alleged reprisals, by a person or other entity not under the direct supervision or direct control of the institution."

remedies are in substantial compliance with the minimum acceptable standards promulgated under subsection (b)." § 1997e(a)(2). Before exhaustion may be required, the court must further conclude that it "would be appropriate and in the interests of justice." § 1997e(a)(1).[12] Finally, in those § 1983 actions meeting all the statutory requirements for exhaustion, the district court may not dismiss the case, but may only "continue such case for a period of not to exceed ninety days in order to require exhaustion." *Ibid.* This detailed scheme is inconsistent with discretion to impose, on an ad hoc basis, a judicially developed exhaustion rule in other cases.

Congress hoped that § 1997e would improve prison conditions by stimulating the development of successful grievance mechanisms. See, *e. g.*, Conf. Rep. 9; H. R. Rep. No. 96–80, p. 4 (1979); 1979 Hearings 4 (remarks of Rep. Railsback); 124 Cong. Rec. 11976 (1978) (remarks of Rep. Railsback); 125 Cong. Rec. 12492 (1979) (remarks of Rep. Drinan); 126 Cong. Rec. 10780 (1980) (remarks of Rep. Kastenmeier). To further this purpose, Congress provided for the deferral of the exercise of federal jurisdiction over certain § 1983 claims only on the condition that the state prisons develop adequate procedures. This purpose would be frustrated by judicial discretion to impose exhaustion generally: the States would have no incentive to adopt grievance

---

[12] The Committee Reports state that Congress did not intend that every § 1983 action brought by an adult prisoner in institutions with appropriate grievance procedures be delayed pending exhaustion:

"It is the intent of the Congress that the court not find such a requirement appropriate in those situations in which the action brought pursuant to [§ 1983] raises issues which cannot, in reasonable probability, be resolved by the grievance resolution system, including cases where imminent danger to life is alleged. Allegations unrelated to conditions of confinement, such as those which center on events outside of the institution, would not appropriately be continued for resolution by the grievance resolution system." Conf. Rep. 15.

See also H. R. Rep. No. 96–80, p. 25 (1979); S. Rep. No. 96–416, p. 34 (1979).

procedures capable of certification, because prisoner § 1983 cases could be diverted to state administrative remedies in any event.

In sum, the exhaustion provisions of the Act make sense, and are not superfluous, only if exhaustion could not be required before its enactment and if Congress intended to carve out a narrow exception to this no-exhaustion rule. The legislative history of § 1997e demonstrates that Congress has taken the approach of carving out specific exceptions to the general rule that federal courts cannot require exhaustion under § 1983. It is not our province to alter the balance struck by Congress in establishing the procedural framework for bringing actions under § 1983.

## C

Respondent and the Court of Appeals argue that exhaustion of administrative remedies should be required because it would further various policies. They argue that an exhaustion requirement would lessen the perceived burden that § 1983 actions impose on federal courts;[13] would further the goal of comity and improve federal-state relations by postponing federal-court review until after the state administrative agency had passed on the issue;[14] and would enable the agency, which presumably has expertise in the area at issue, to enlighten the federal court's ultimate decision.

---

[13] Of course, this burden alone is not sufficient to justify a judicial decision to alter congressionally imposed jurisdiction. See *Thermtron Products, Inc.* v. *Hermansdorfer*, 423 U. S. 336, 344 (1976); *Steelworkers* v. *Bouligny, Inc.*, 382 U. S. 145, 150–151 (1965). In any event, it is by no means clear that judicial discretion to impose an exhaustion requirement in § 1983 actions would lessen the caseload of the federal courts, at least in the short run. See *infra*, at 513–514, and n. 18.

[14] The application of these federalism principles to actions brought pursuant to § 1983 has prompted criticism by several commentators. See, *e. g.*, Koury, Section 1983 and Civil Comity: Two for the Federalism Seesaw, 25 Loyola L. Rev. 659 (1979); Note, 39 N. Y. U. L. Rev. 838 (1964).

As we noted earlier, policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with congressional intent. See *supra*, at 501–502, and n. 4. Furthermore, as the debates over incorporating the exhaustion requirement in § 1997e demonstrate, the relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them.[15] The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable. Cf. *Diamond* v. *Chakrabarty*, 447 U. S. 303, 317 (1980); *Steelworkers* v. *Bouligny, Inc.*, 382 U. S. 145, 150, 153 (1965).

Beyond the policy issues that must be resolved in deciding *whether* to require exhaustion, there are equally difficult questions concerning the design and scope of an exhaustion requirement. These questions include how to define those categories of § 1983 claims in which exhaustion might be de-

---

[15] For example, there is serious disagreement over whether judicial or administrative procedures offer § 1983 plaintiffs the swiftest, least costly, and most reliable remedy. See, *e. g.*, 1977 Hearings 263–264; *id.*, at 232–233; Note, 68 Colum. L. Rev. 1201, 1207 (1968). Similarly, there is debate over whether the specialization of federal courts in constitutional law is more important than the specialization of administrative agencies in their areas of expertise, and over whether the symbolic and institutional function of federal courts in defining, legitimizing, and enforcing constitutional claims outweighs the educational function that state and local agencies can serve. See, *e. g.*, Whitman, Constitutional Torts, 79 Mich. L. Rev. 5, 23 (1980); Note, 68 Colum. L. Rev., *supra*, at 1208. Finally, it is uncertain whether the present "free market" system, under which litigants are free to pursue administrative remedies if they truly appear to be cheaper, more efficient, and more effective, is more likely to induce the creation of adequate remedies than a *McKart*-type standard under which plaintiffs have no initial choice. See, *e. g.*, Note, 8 Ind. L. Rev. 565 (1975). Cf. 1977 Hearings 21, 34, 51; Hearings on S. 1393 before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 442 (1977).

sirable; how to unify and centralize the standards for judging the kinds of administrative procedures that should be exhausted;[16] what tolling requirements and time limitations should be adopted;[17] what is the res judicata and collateral estoppel effect of particular administrative determinations; what consequences should attach to the failure to comply with procedural requirements of administrative proceedings; and whether federal courts could grant necessary interim injunctive relief and hold the action pending exhaustion, or proceed to judgment without requiring exhaustion even though exhaustion might otherwise be required, where the relevant administrative agency is either powerless or not inclined to grant such interim relief. These and similar questions might be answered swiftly and surely by legislation, but would create costly, remedy-delaying, and court-burdening litigation if answered incrementally by the judiciary in the context of diverse constitutional claims relating to thousands of different state agencies.[18]

---

[16] Section 1997e resolved this problem by directing the Attorney General to promulgate minimum standards and to establish a procedure by which prison administrative remedies could be reviewed and certified. §§ 1997e(b) and (c). If a procedure has not been certified, the court is directed to compare the procedure with the Attorney General's standards and to continue the case pending exhaustion only if the procedure is in substantial compliance with the standards of the Attorney General. § 1997e(a)(2).

[17] Unless the doctrine that statutes of limitations are not tolled pending exhaustion were overruled, see Board of Regents v. Tomanio, 446 U. S. 478 (1980), a judicially imposed exhaustion requirement might result in the effective repeal of § 1983. Congress avoided this problem in § 1997e by directing the court to merely continue the case for a period not to exceed 90 days.

[18] The initial bill proposing to include an exhaustion requirement in § 1997e provided:

"Relief shall not be granted by a district court in an action brought pursuant to [§ 1983] by an individual involuntarily confined in any State institution . . . , unless it appears that the individual has exhausted such plain,

The very variety of claims, claimants, and state agencies involved in § 1983 cases argues for congressional consideration of the myriad of policy considerations, and may explain why Congress, in deciding whether to require exhaustion in certain § 1983 actions brought by adult prisoners, carved out such a narrow, detailed exception to the no-exhaustion rule. After full debate and consideration of the various policy arguments, Congress adopted § 1997e, taking the largest class of § 1983 actions and constructing an exhaustion requirement that differs substantially from the *McKart*-type standard urged by respondent and adopted by the Court of Appeals. See n. 18, *supra*. It is not for us to say whether Congress will or should create a similar scheme for other categories of § 1983 claims or whether Congress will or should adopt an altogether different exhaustion requirement for nonprisoner § 1983 claims.[19]

---

speedy, and efficient State administrative remedy as is available." H. R. 5791, 95th Cong., 1st Sess., § 4 (1977).

Congress declined to adopt this *McKart*-type standard after witnesses testified that this procedure would bog down the courts in massive procedural litigation thereby frustrating the purpose of relieving the caseloads of the federal courts, that state procedures are often not effective and take too much time, and that the court would have to judge a myriad of state procedures without much guidance. See, *e. g.*, 1977 Hearings 34–35, 51, 164–165, 169–170, 263–264, 323; 1979 Hearings 48–49.

[19] The question was posed from the bench at oral argument whether the Eleventh Amendment might bar this suit on the ground that the Board of Regents is an arm of the State for purposes of the Eleventh Amendment. Tr. of Oral Arg. 20. Cf. *Alabama* v. *Pugh*, 438 U. S. 781 (1978). Compare *Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911), with *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981). The District Court dismissed this action on the pleadings, and no Eleventh Amendment issue had been raised. The Board of Regents first raised this issue in its brief to the original panel on appeal, but did not argue it in its brief on rehearing en banc. Neither the original panel nor the en banc court addressed this issue. Although the State mentioned a possible Eleventh Amendment defense in its response in opposition to the

## IV

Based on the legislative histories of both § 1983 and § 1997e, we conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983. We decline to overturn our prior decisions holding that such exhaustion is not required. The decision of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST joins, concurring.

As discussed in JUSTICE POWELL's dissenting opinion, as well as in the opinion of the court below, considerations of sound policy suggest that a § 1983 plaintiff should be required to exhaust adequate state administrative remedies before filing his complaint. At the very least, prior state adminis-

---

petition for certiorari, it did not brief the issue or press it at oral argument. Indeed, counsel for respondent urged that we affirm the Court of Appeals solely on its exhaustion holding. Tr. of Oral Arg. 24, 27.

We have noted that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar" that it may be raised by the State for the first time on appeal. *Edelman* v. *Jordan,* 415 U. S. 651, 678 (1974). However, because of the importance of state law in analyzing Eleventh Amendment questions and because the State may, under certain circumstances, waive this defense, we have never held that it is jurisdictional in the sense that it must be raised and decided by this Court on its own motion. Cf. *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 279 (1977). Where, as here, the Board of Regents expressly requested that we address the exhaustion question and not pass on its potential Eleventh Amendment immunity, and, as a consequence, the parties have not briefed the issue, we deem it appropriate to address the issue that was raised and decided below and vigorously pressed in this Court. Nothing in this opinion precludes the Board of Regents from raising its Eleventh Amendment claim on remand. The District Court is in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the Eleventh Amendment issue, and at this stage it has the discretion to permit amendments to the pleadings that might cure any potential Eleventh Amendment problems.

trative proceedings would resolve many claims, thereby decreasing the number of § 1983 actions filed in the federal courts, which are now straining under excessive caseloads. However, for the reasons set forth in the Court's opinion, this Court already has ruled that, in the absence of additional congressional legislation, exhaustion of administrative remedies is not required in § 1983 actions. Perhaps Congress' enactment of the Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV), which creates a limited exhaustion requirement for prisoners bringing § 1983 suits, will prompt it to reconsider the possibility of requiring exhaustion in the remainder of § 1983 cases. Reluctantly, I concur.

JUSTICE WHITE, concurring in part.

I fully agree with the Court that our frequent and unequivocal statements on exhaustion cannot be explained or distinguished away as the Fifth Circuit attempted to do. For nearly 20 years and on at least 10 occasions, this Court has clearly held that no exhaustion of administrative remedies is required in a § 1983 suit. *Ante,* at 500. Whether or not this initially was a wise choice, these decisions are *stare decisis,* and in a statutory case, a particularly strong showing is required that we have misread the relevant statute and its history. I have no difficulty in concluding that on the issue of exhaustion, unlike the question of municipal immunity faced in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), the Court has not previously misapprehended the meaning of the 1871 debates in rejecting an exhaustion rule in *McNeese* v. *Board of Education,* 373 U. S. 668, 671–673 (1963), and adhering to that position ever since. Our precedents and the legislative history are sufficient to support reversal, and I accordingly join the judgment and all but Part III–B of the opinion of the Court.

In Part III–B, the Court unnecessarily and unwisely ventures further to find support where none may be had. The wisdom of a general no-exhaustion rule in § 1983 suits was

not at issue when Congress considered and passed the Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV). As JUSTICE POWELL persuasively points out in his dissenting opinion, and as reflected in the title of the Act, congressional attention was narrowly focused on procedures concerning the legal rights of prisoners and other institutionalized persons. Unsurprisingly, the legislation which emerged addressed only the specific problem under investigation; it indicates neither approval of a no-exhaustion rule nor an intent to preclude us from reconsidering the issue.

As the Court acknowledges, *ante,* at 513, the policy arguments cut in both directions. The Court concludes that "the very difficulty of these policy considerations, and Congress' superior institutional competence . . . suggest that legislative not judicial decisions are preferable." To be sure, exhaustion is a statutory issue and the dispositive word on the matter belongs to Congress. It does not follow, however, that, were the issue not foreclosed by earlier decisions, we would be institutionally incompetent to formulate an exhaustion rule. The lack of an exhaustion requirement in § 1983 actions is itself an exception to the general rule, judicially formulated, that exhaustion of administrative remedies is required in a civil action. *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41 (1938); *McKart* v. *United States,* 395 U. S. 185 (1969). Unlike other statutory questions, exhaustion is "a rule of judicial administration," *Myers* v. *Bethlehem Shipping Corp., supra,* at 50, and unless Congress directs otherwise, rightfully subject to crafting by judges. Our resolution of this case as governed by *stare decisis,* reinforced by the legislative history of § 1983, should not be taken as undercutting the general exhaustion principle of long standing. The result today is also fully consistent with our decisions that a defendant in a civil or administrative enforcement proceeding may not enjoin and sidetrack that proceeding by resorting to a § 1983 action in federal court, *Huffman*

v. *Pursue, Ltd.*, 420 U. S. 592 (1975); *Juidice* v. *Vail*, 430 U. S. 327 (1977); *Trainor* v. *Hernandez*, 431 U. S. 434 (1977); *Moore* v. *Sims*, 442 U. S. 415 (1979), and that a federal action should be stayed pending determination of state-law issues central to the constitutional dispute. *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941). On this understanding, I join all but Part III–B of the opinion of the Court.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE joins as to Part II, dissenting.

The Court holds that the limitations on federal judicial power embodied in the Eleventh Amendment and in the doctrine of sovereign immunity are not jurisdictional. I con-

---

*In my view, this case does not present a serious Eleventh Amendment issue. The Florida statute authorizing suits against the Board of Regents, Fla. Stat. § 240.205 (1981), is clear on its face. I see no reason to read a broad waiver to sue and be sued in "all courts of law and equity" as meaning all but federal courts. Nor am I aware of anything in Florida law that suggests a more limited meaning was intended than indicated by the unequivocal terms of the statute. Certainly, none of our cases have gone so far as to hold that federal courts must be expressly mentioned for an effective Eleventh Amendment waiver.

The statutes at issue in cases recited by JUSTICE POWELL, *post*, at 522–523, n. 5, presented more equivocal embodiments of state intent. For example, in *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981) *(per curiam)*, the authorization to sue and be sued was limited to contract actions and, unlike the instant provision, did not extend to "all courts of law and equity." The same is true of the interstate compact involved in *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275 (1959). The decision in *Kennecott Copper Corp.* v. *Tax Comm'n*, 327 U. S. 573 (1946), which involved a statute providing for suit in "any court of competent jurisdiction," turned on the incongruity of federal courts' interpreting state tax laws and the fact that "Utah employs explicit language to indicate, in other litigation, its consent to suits in federal courts." *Id.*, at 579.

Thus, while I do not object to the Court's leaving the Eleventh Amendment issue for further consideration by the lower courts—at least where, as here, there is no logical priority in resolving Eleventh Amendment immunity before exhaustion—I find the issue sufficiently clear to be answered here and now. The statute means what it says.

sider this holding to be a serious departure from established constitutional doctrine.

I dissent also from the Court's rejection of the rule of "flexible" exhaustion of state administrative remedies developed and stated persuasively by the Court of Appeals for the Fifth Circuit, sitting en banc. In disagreeing with the 17 judges of the Court of Appeals who adopted the flexible exhaustion principle, this Court places mistaken reliance on the Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV). I disagree with both portions of the Court's holding and therefore dissent.

## I. The Eleventh Amendment.[1]
### A

In this "reverse discrimination" action, petitioner, an employee of the Florida International University, brought suit under 42 U. S. C. § 1983 against the Board of Regents of the State of Florida.[2] She did not name the individual Regents as defendants. She sued for $500,000 in damages, and for injunctive and other equitable relief. See *ante*, at 498–499, n. 2. The Board filed a motion to dismiss, arguing that petitioner's suit was premature in light of her failure to exhaust available administrative remedies. The District Court agreed and granted the motion to dismiss.

---

[1] The Eleventh Amendment provides:
"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

[2] As the Court notes, see *ante*, at 498, n. 1, petitioner originally named the Florida International University as defendant. Because the Florida International University lacks the capacity to sue or be sued, the District Court found that it was not a proper defendant. Petitioner was permitted to amend her complaint, and she simply substituted the Board of Regents.

In addition to racial discrimination, petitioner also claimed that she had been discriminated against on the basis of her sex.

On petitioner's appeal, the Board added the bar of the Eleventh Amendment to its defense.[3]  It argued that as an instrumentality of the State, the Board could not be subjected to suit in federal court absent a waiver of immunity.[4]

[3] The Court repeatedly has held that the defense of the Eleventh Amendment may be raised for the first time on appeal.  See *Edelman* v. *Jordan*, 415 U. S. 651, 678 (1974) ("Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court").

The Board's brief on appeal was divided into three parts.  Part III was devoted to the argument that "the Eleventh Amendment precludes subject matter jurisdiction over plaintiff's complaint."  Brief for Defendant-Appellee in No. 79–2965 (CA5), p. 17.  A lengthy statutory addendum was attached in support of the arguments advanced in this section of the brief.  After the case was scheduled for rehearing en banc, the parties filed short—*i. e.*, 4- and 10-page—supplemental briefs to be considered in addition to the main briefs already submitted to the Court of Appeals.  The supplemental briefs did not add to the discussion of the Eleventh Amendment issue.  But the question was placed before the Court of Appeals en banc, as it had been placed before the panel, through the thorough discussion in the main briefs.

This Court's explanation for not addressing the Eleventh Amendment issue is that it was not considered below.  See *ante*, at 515–516, n. 19.  But contrary to the implication in the Court's explanation, the issue—as shown here—was urged by the Board and argued here.

[4] The Board of Regents of the Division of Universities of the Department of Education is established by the Florida Education Code as a part of the State University System.  Fla. Stat. § 240.2011 (1981).  The Board consists of the Commissioner of Education and 12 citizens appointed by the Governor.  § 240.207.  The Board has general supervisory authority over the State University System.  § 240.209.  Among its duties are the appointment of university presidents, the review of budget requests of each university in the state system, the preparation of an aggregated budget for the State University System, the development of a master plan, and the establishment of a systemwide personnel classification and pay plan.  *Ibid.*

The Board is an agency of the State of Florida.  § 216.011.  See *Relyea* v. *State*, 385 So. 2d 1378 (Fla. App. 1980).  It may claim the defense of sovereign immunity in suits under state law.  See *ibid.*

Numerous Courts of Appeals have held state universities or state Boards of Regents immune from suit in federal court by reason of the Elev-

And it asserted that there had been no waiver. Although the Board of Regents was created as a body corporate with power "to sue and be sued . . . to plead and be impleaded in all courts of law and equity," Fla. Stat. § 240.205(4)(1) (1981), it is well established that language such as this does not operate to waive the defense of the Eleventh Amendment.[5] In

enth Amendment. See, e. g., *Rutledge* v. *Arizona Board of Regents*, 660 F. 2d 1345, 1349 (CA9 1981); *Brennan* v. *University of Kansas*, 451 F. 2d 1287 (CA10 1971); *Ronwin* v. *Shapiro*, 657 F. 2d 1071 (CA9 1981).

[5] See, e. g., *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 150 (1981); *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 276–277 (1959) ("The conclusion that there has been a waiver of immunity will not be lightly inferred. . . . And where a public instrumentality is created with the right 'to sue and be sued' that waiver of immunity in the particular setting may be restricted to suits or proceedings of a special character in the state, not the federal courts"); *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573 (1946) (language in state statute providing for suit in "any court of competent jurisdiction" will not be understood as a waiver of the Eleventh Amendment); *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459 (1945) (same); *Great Northern Life Insurance Co.* v. *Read*, 322 U. S. 47, 54 (1944) ("a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation must be found"); *Jagnandan* v. *Giles*, 538 F. 2d 1166, 1177 (CA5 1976). Cf. *Edelman* v. *Jordan, supra*, at 673 ("In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction' "). It is difficult to reconcile the Court's consistent requirement of an express waiver with the approach advocated by JUSTICE WHITE. See *ante*, at 519, n.

At oral argument here counsel for respondent stated that the Florida Legislature had not waived the Eleventh Amendment and had waived the defense of sovereign immunity "only in selected tort cases." Tr. of Oral Arg. 26. See *Bragg* v. *Board of Public Instruction*, 36 So. 2d 222 (Fla. 1948) ("The mere fact that the Board of Public Instruction is created as a body corporate with power to sue and be sued does not affect its immunity from tort"); *Relyea* v. *State, supra* (Board of Regents retains defense of sovereign immunity); Fla. Stat. § 111.071(1)(b)(4) (1981) (provision for payment by the State of civil rights judgments against state officers—including judgments under 42 U. S. C. § 1983 (1976 ed., Supp. IV)—does not waive sovereign immunity "or any other defense or immunity" to such lawsuits). Cf. *Long* v. *Richardson*, 525 F. 2d 74, 79 (CA6 1975)

reply, petitioner argued that whether or not the statute creating the Board amounted to a waiver—and petitioner believed that it did—the Eleventh Amendment simply was irrelevant to the equitable claims she had lodged against the State. See Reply Brief for Petitioner 3–4.

Neither the Court of Appeals panel nor the Court of Appeals en banc addressed the Board's Eleventh Amendment defense. They directed their attention solely to the question of exhaustion of administrative remedies. The panel held that there was no exhaustion requirement in § 1983 suits and remanded to the District Court for consideration of the Board's Eleventh Amendment argument. *Patsy* v. *Florida International University*, 612 F. 2d 946 (1980). The Court of Appeals, sitting en banc, reversed, holding that § 1983 plaintiffs must exhaust available and reasonable administrative remedies. *Patsy* v. *Florida International University*, 634 F. 2d 900 (1981). Again the court did not consider the Board's Eleventh Amendment defense.

The Eleventh Amendment question was raised before this Court, at the first opportunity after the Court of Appeals' decision, in the Board's response to the petition for writ of certiorari. The Board argued, as it had on appeal, that it was an arm of the State and that it had not waived its immunity from suit in federal court.[6] Again petitioner answered that

---

(state university's immunity from suit under state law disposes of Eleventh Amendment question).

[6] See Brief in Opposition 23 ("Should this Court grant the writ, the Board respectfully submits that review should be limited to the jurisdictional issues discussed below and this Court should vacate the Fifth Circuit's decision with instructions to dismiss [petitioner's] suit for lack of jurisdiction").

The Court, *ante*, at 516, n. 19, attaches importance to the statement at oral argument by counsel for the Board that the Board wanted the exhaustion issue decided. This must be viewed, however, in light of the Board's unsuccessful attempt to have this Court *first* decide the Eleventh Amendment issue. Moreover, a party's request—short of a binding waiver—cannot relieve this Court of its duty to resolve a jurisdictional question.

at most the Eleventh Amendment defense would bar her claim for damages. And, even as to this claim, petitioner now argued that the Amendment would not bar damages if the Board could meet the claim out of its "own funds"—*e. g.*, from gifts and bequests—rather than from the state treasury. These arguments were repeated at oral argument.[7]

## B

The Court views the jurisdictional question presented by the Eleventh Amendment as if it were of little or no importance. Its entire discussion of the question is relegated to a conclusory note at the end of the opinion. See *ante*, at 515–516, n. 19. The Court concedes that the Amendment and the bar of sovereign immunity are "jurisdictional," but only in the sense that the State may raise the claim at any point in the proceedings. The statement is then made that the Amendment is not jurisdictional "in the sense that it must be raised and decided by this Court on its own motion." *Ibid.*[8] The Court cites to no authority in support of this statement,[9] and

---

[7] Tr. of Oral Arg. 25–28, 40–41. At oral argument, the Board's counsel stated that the Eleventh Amendment question had not been addressed in its main briefs to this Court "because of the grant of certiorari." *Id.*, at 27.

[8] In view of the Board's repeated efforts to raise the Eleventh Amendment question, and its specific request that this Court vacate the decision of the Court of Appeals for lack of jurisdiction, see n. 6, *supra*, it is hardly correct to say that the Court must now raise the question of jurisdiction on its own motion. Cf. *Sosna* v. *Iowa*, 419 U. S. 393, 396, n. 2 (1975). In any event, "we are obliged to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction." *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 278 (1977).

[9] The Court cites, with a "compare" signal, to *Mt. Healthy City Bd. of Ed.* v. *Doyle, supra*, at 279. The *Mt. Healthy* Court in no way suggested that the Eleventh Amendment and the principle of sovereign immunity embodied in Art. III were less than jurisdictional. Indeed, the Court found it necessary to resolve the Eleventh Amendment question in that case prior to reaching the merits.

On the contrary, the Court consistently has viewed the Amendment as jurisdictional. In *Sosna* v. *Iowa, supra*, at 396, n. 2, the Court raised the

it would be surprising if any existed. The reason that the Eleventh Amendment question may be raised at any point in the proceedings is precisely because it places limits on the basic authority of federal courts to *entertain* suits against a State. The history and text of the Eleventh Amendment, the principle of sovereign immunity exemplified by it, and the well-established precedents of this Court make clear that today's decision misconceives our jurisdiction and the purpose of this Amendment.

A basic principle of our constitutional system is that the federal courts are courts of limited jurisdiction. Their authority extends only to those matters within the judicial power of the United States as defined by the Constitution. In language that could not be clearer, the Eleventh Amendment removes from the judicial power, as set forth in Art. III, suits "commenced or prosecuted against one of the United States." When an Amendment to the Constitution states in plain language that "the judicial power of the United States shall not be construed to extend" to suits against a State, from what source does the Court today derive its jurisdiction? The Court's "back-of-the-hand" treatment of this threshold issue offers no answer. Questions of jurisdiction and of the legitimate exercise of power are fundamental in our federal constitutional system.[10]

---

question of the Eleventh Amendment even though the State had asserted the bar of the Amendment only in its answer to the complaint and had thereafter abandoned this defense. Unlike the Board of Regents in this case, the State of Iowa had not advanced the defense in this Court. Even so, the *Sosna* Court raised and addressed the question. These precedents are ignored by the Court today.

[10] "Because of their unusual nature, and because it would not simply be wrong but indeed would be an unconstitutional invasion of the powers reserved to the states if the federal courts were to entertain cases not within their jurisdiction, the rule is well settled that the party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the competence of that court." C. Wright & A. Miller, Federal Practice and Procedure § 3522, p. 45 (1975).

## C

The Eleventh Amendment was adopted as a response to this Court's assumption of original jurisdiction in a suit brought against the State of Georgia. *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). Relying upon express language in Art. III extending the judicial power to controversies between a State and citizens of another State, the Court found that it had jurisdiction. The decision is said to have created a shock throughout the country. See *Hans* v. *Louisiana*, 134 U. S. 1, 11 (1890). The Amendment was adopted shortly thereafter, and the Court understood that it had been overruled: "'the amendment being constitutionally adopted, there could not be exercised any jurisdiction, in any case, past or future, in which a State was sued by the citizens of another State, or by citizens or subjects of any foreign state.'" *Ibid.*

In light of the history and wording of the Amendment, the Court has viewed the Amendment as placing explicit limits on the judicial power as defined by Art. III. See *Nevada* v. *Hall*, 440 U. S. 410, 421 (1979). But more than that, and beyond the express provisions of the Amendment, the Court has recognized that the Amendment stands for a principle of sovereign immunity by which the grant of authority in Art. III itself must be measured.[11] Thus, in *Hans* v. *Louisiana*, *supra*, the Court held that the federal judicial power did not extend to a suit against a nonconsenting State by one of its own citizens. Although the Eleventh Amendment by its terms does not apply to such suits, the Court found that

---

[11] "[T]he Eleventh Amendment was introduced to clarify the intent of the Framers concerning the reach of the federal judicial power. . . . The Eleventh Amendment served effectively to reverse the particular holding in *Chisholm*, and, more generally, to restore the original understanding . . . . Thus, despite the narrowness of the language of the Amendment, its spirit has consistently guided this Court in interpreting the reach of the federal judicial power generally . . . ." *Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279, 291–292 (1973) (MARSHALL, J., concurring in result).

the language of the Amendment was but an illustration of a larger principle: Federal jurisdiction over suits against a State, absent consent, "was not contemplated by the Constitution when establishing the judicial power of the United States." *Id.*, at 15.[12] See *Smith* v. *Reeves*, 178 U. S. 436 (1900).

Similarly, in *Ex parte New York*, 256 U. S. 490 (1921), the Court found that despite the Eleventh Amendment's specific reference to suits in "law or equity," the principle of sovereign immunity exemplified by the Amendment would not permit the extension of federal admiralty jurisdiction over a nonconsenting State. The Court applied the same approach in *Monaco* v. *Mississippi*, 292 U. S. 313 (1934), in which the Court refused to take jurisdiction over a suit against a State by a foreign state. On its face, Art. III provided jurisdiction over suits "between a State . . . and foreign States." Nor did the Eleventh Amendment specifically exempt the States from suit by a foreign state. Nevertheless, the Court concluded that the judicial power of the United States, granted by Art. III, did not extend so far: "We think that Madison correctly interpreted Clause one of § 2 of Article III of the Constitution as making provision for jurisdiction of a suit against a State by a foreign State in the event of the State's consent but not otherwise." *Id.*, at 330.

In this case a resident of the State of Florida has sued a Board exercising a major function of the State's sovereign authority. As prior decisions have held, whether this case is viewed only under the Eleventh Amendment—with its

---

[12] The *Hans* Court quoted at some length from the constitutional debates concerning the scope of Art. III. In the eighty-first number of the Federalist, for example, Hamilton sought to dispel the suggestion that Art. III extended federal jurisdiction over suits brought against one of the States: "'It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.'" As quoted in 134 U. S., at 13 (emphasis in original).

explicit limitation on federal jurisdiction—or under Art. III, the analysis must be the same. Absent consent, the "judicial power of the United States," as defined by Art. III and the Eleventh Amendment, simply does not extend to suits against one of the States by a citizen of that State: [13]

> "That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that *the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given:* not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification." *Ex parte New York, supra,* at 497 (emphasis added).

The Court does not distinguish these unquestioned precedents. They are wholly and inexplicably ignored. Quite

---

[13] Unlike other limitations on federal jurisdiction, the limitation imposed by the Eleventh Amendment and the doctrine of sovereign immunity may be waived by consent unequivocally expressed. This was the understanding of the doctrine at the time the Constitution was adopted, see n. 11, *supra,* and the Court has interpreted the "judicial power of the United States" as used in the Eleventh Amendment and Art. III accordingly. But the fact that the State or the United States may consent to federal jurisdiction, does not render the Eleventh Amendment or the doctrine of sovereign immunity embodied in Art. III "quasi" jurisdictional. Quite simply, where there has not been consent, there is no jurisdiction. See *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit"); *United States* v. *United States Fidelity & Guaranty Co.,* 309 U. S. 506, 514 (1940) ("Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void").

simply the Court today disregards controlling decisions and the explicit limitation on federal-court jurisdiction in Art. III and the Eleventh Amendment. The Court does recognize that the Eleventh Amendment is jurisdictional "in the sense" that the State may raise the bar of the Amendment for the first time on appeal. Yet the Court misses the point of this statement. The reason that the bar of the Amendment may be raised at any time—as the Court previously has explained— is precisely because it *is* jurisdictional:

> "The objection to petitioner's suit as a violation of the Eleventh Amendment was first made and argued . . . in this Court. This was in time, however. The Eleventh Amendment declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment . . . even though urged for the first time in this Court." *Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459, 467 (1945).[14]

Despite these precedents, and apparently because of an unexplained anxiety to reach the exhaustion issue decided by the Court of Appeals, this Court remands the issue of *its own* jurisdiction to the courts below.

## D

I believe that the Eleventh Amendment question must be addressed and that the answer could hardly be clearer. This is an action under § 1983.[15] Petitioner seeks relief from the

---

[14] See *Edelman* v. *Jordan*, 415 U. S., at 678; *Sosna* v. *Iowa*, 419 U. S., at 396, n. 2; *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S., at 278. The Court has consistently viewed the Eleventh Amendment question as jurisdictional. See *Great Northern Life Insurance Co.* v. *Read*, 322 U. S., at 51 ("A state's *freedom from litigation* was established as a constitutional right through the Eleventh Amendment") (emphasis added); *Monaco* v. *Mississippi*, 292 U. S. 313, 320 (1934) (Question is "whether this Court has jurisdiction *to entertain* a suit brought by a foreign State against a State without her consent") (emphasis added).

[15] The States consented to a diminution of their sovereignty by ratifying the Fourteenth Amendment. In its exercise of the powers granted to it

Board of Regents of the State of Florida, a major instrumentality or agency of the State. Petitioner's argument that the statute incorporating the Board should be understood to waive the Eleventh Amendment is foreclosed by numerous decisions of this Court and is unsupported by State law. See, *e. g., Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981); n. 5, *supra*. Similarly, petitioner's suggestion that the Eleventh Amendment does not bar her equitable claims against the Board must be rejected. The Amendment applies to suits "in law *or* equity." All suits against an unconsenting State—whether for damages or injunctive relief—are barred. See *Cory* v. *White, ante*, p. 85.[16] Finally, the rule in *Ex parte Young*, 209 U. S. 123 (1908), permitting a federal court to order state *officials* to obey federal law in the future, is simply irrelevant to this case.[17] Petitioner did not sue the members of the Board of

by § 5 of the Fourteenth Amendment, Congress may lift the bar of sovereign immunity. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976). Thus, if petitioner had brought this suit under Title VII of the Civil Rights Act of 1964, there would have been no jurisdictional problem. But petitioner did not do so, and the Court has held that Congress has not removed the bar of sovereign immunity in § 1983 actions. See *Quern* v. *Jordan*, 440 U. S. 332 (1979).

[16] "It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought. . . . [T]he Eleventh Amendment by its terms clearly applies to a suit seeking an injunction, a remedy available only from equity." *Cory* v. *White, ante*, at 90–91.

[17] Under the theory of *Ex parte Young* the Eleventh Amendment does not bar suits against state officers because when a state officer "comes into conflict with the superior authority of [the] Constitution, . . . he is . . . stripped of his official or representative character." 209 U. S., at 159–160. The rationale of that decision has no application to suits against the State or its agencies. Although an individual official may be viewed as acting on his own and without state authority when acting against federal law, the State—or an agency of the State—cannot act other than in its official state capacity. Similarly, an action for damages against the State, or an arm of the State, seeks damages that must be paid from the State's own coffers—whether the damages come directly from the State's general fund

Regents. She sued the Board itself, an arm of the State of Florida.

In my view, the Eleventh Amendment—and the principle of sovereign immunity exemplified by the Amendment and embodied in Art. III—clearly bar the suit in this case. The Court's refusal to address the question of its own jurisdiction violates well-established precedents of this Court as well as the basic premise that federal courts are courts of limited jurisdiction. Even had the parties neglected to address the Eleventh Amendment question, it would have been our responsibility to consider it on our own motion. In fact, the question has been fully briefed to the Court of Appeals and

---

or from some other state fund. See *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573 (1946) (segregated funds of the State Tax Commission are state moneys subject to the Eleventh Amendment).

Moreover, the fact that the Board is a corporate entity under state law does not permit application of the rule in *Ex parte Young* to the Board itself—as if the Board were an official. This Court repeatedly has held the Eleventh Amendment to bar suit against such state corporate agencies. See *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147 (1981); *Great Northern Insurance Co.* v. *Read, supra; Ford Motor Co.* v. *Department of Treasury of Indiana*, 323 U. S. 459 (1945); *Kennecott Copper Corp.* v. *State Tax Comm'n, supra.*

*Hopkins* v. *Clemson Agricultural College*, 221 U. S. 636 (1911), is not to the contrary. In that case suit was brought against a state college in *state court* to recover damages caused by the college's construction of a dyke. Although the Court discussed the Eleventh Amendment in some detail, there was simply no Eleventh Amendment question in that case. It was clear before *Hopkins* that the Eleventh Amendment did not apply to bar review in this Court of any federal question presented in a suit against a State in *state* court. See *Chandler* v. *Dix*, 194 U. S. 590, 592 (1904). Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978). Moreover, the *Hopkins* Court did not consider the college's activities in that case to be governmental. 221 U. S., at 647. In short, no Eleventh Amendment question was presented to the Court. The opinion in *Hopkins* has never been cited by this Court for the proposition that the Eleventh Amendment is no bar to suit against a state corporate agency in federal court. See *Florida Dept. of Health* v. *Florida Nursing Home Assn., supra; Alabama* v. *Pugh*, 438 U. S. 781 (1978); *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964).

raised in this Court. See n. 8, *supra*. Cf. *Sosna* v. *Iowa*, 419 U. S. 393, 396, n. 2 (1975). I would dismiss this suit and vacate the decision of the Court of Appeals for lack of jurisdiction.

## II. Exhaustion of Remedies.

In view of my belief that this case should be dismissed on jurisdictional grounds, I address the exhaustion question only briefly. Seventeen judges joined in the Court of Appeals' persuasive opinion adopting a rule of "flexible" exhaustion of administrative remedies in § 1983 suits. Other Courts of Appeals have adopted a similar rule. See, *e. g.*, *Eisen* v. *Eastman*, 421 F. 2d 560 (CA2 1969); *Secret* v. *Brierton*, 584 F. 2d 823 (CA7 1978). The opinion for the en banc court carefully reviewed the exhaustion doctrine in general and as applied to § 1983 actions. It found that the prior decisions of this Court did not clearly decide the question.[18] See *Barry* v. *Barchi*, 443 U. S. 55, 63, n. 10 (1979); *Gibson* v. *Berryhill*, 411 U. S. 564, 575, n. 14 (1973). And it concluded that the exhaustion of adequate and appropriate state administrative remedies would promote the achievement of the rights protected by § 1983.

I agree with the Court of Appeals' opinion. The requirement that a § 1983 plaintiff exhaust adequate state administrative remedies was the accepted rule of law until quite recently. See *Eisen* v. *Eastman*, *supra*, at 567. The rule rests on sound considerations. It does not defeat federal-court jurisdiction, it merely defers it.[19] It permits the States

---

[18] "[I]n all the cases in which the Supreme Court has articulated its no-exhaustion rule, the state administrative remedies were sufficiently inadequate that exhaustion would not have been appropriate in any event." Developments in the Law, Section 1983 and Federalism, 90 Harv. L. Rev. 1133, 1274 (1977).

[19] Cf. *Fair Assessment in Real Estate Assn.* v. *McNary*, 454 U. S. 100, 136 (1981) (BRENNAN, J., concurring in judgment) (exhaustion requirement in § 1983 cases can be justified by "a somewhat lesser showing . . . where . . . we are concerned not with the displacement of the § 1983 rem-

to correct violations through their own procedures, and it encourages the establishment of such procedures. It is consistent with the principles of comity that apply whenever federal courts are asked to review state action or supersede state proceedings. See *Younger* v. *Harris*, 401 U. S. 37 (1971).

Moreover, and highly relevant to the effective functioning of the overburdened federal court system, the rule conserves and supplements scarce judicial resources. In 1961, the year that *Monroe* v. *Pape*, 365 U. S. 167, was decided, only 270 civil rights actions were begun in the federal district courts. Annual Report of the Director of the Administrative Office of the U. S. Courts, 238 (1961). In 1981, over 30,000 such suits were commenced.[20] Annual Report of the Director of the Administrative Office of the U. S. Courts 63, 68 (1981). The result of this unprecedented increase in civil rights litigation is a heavy burden on the federal courts to the detriment of all federal-court litigants, including others who assert that their constitutional rights have been infringed.

The Court argues that past decisions of the Court categorically hold that there is no exhaustion requirement in § 1983 suits. But as the Court of Appeals demonstrates, and as the Court recognizes, many of these decisions can be explained as applications of traditional exceptions to the exhaustion requirement. See *McNeese* v. *Board of Education*, 373 U. S. 668 (1963). Other decisions speak to the question in an offhand and conclusory fashion without full briefing and argument. See *Wilwording* v. *Swenson*, 404 U. S. 249, 251 (1971) (unargued *per curiam*); *Damico* v. *California*, 389 U. S. 416 (1967) (unargued *per curiam*). Moreover, a cate-

---

edy, but with the deferral of federal court consideration pending exhaustion of the state *administrative* process").

[20] Of the approximately 30,000 civil rights suits filed in fiscal year 1981, 15,639 were filed by state prisoners under § 1983. The remainder involved a variety of civil rights suits. Annual Report of the Director of the Administrative Office of the U. S. Courts 63, 68 (1981). See *Parratt* v. *Taylor*, 451 U. S. 527, 554, n. 13 (1981) (POWELL, J., concurring in result).

gorical no-exhaustion rule would seem inconsistent with the decision in *Younger* v. *Harris, supra,* prescribing abstention when state criminal proceedings are pending. At least where administrative proceedings are pending, *Younger* would seem to suggest the appropriateness of exhaustion. Cf. *Gibson* v. *Berryhill, supra,* at 574–575. Yet the Court today adopts a flat rule without exception.

The Court seeks to support its no-exhaustion rule with indications of congressional intent. Finding nothing directly on point in the history of the Civil Rights Act itself, the Court places primary reliance on the recent Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997 *et seq.* (1976 ed., Supp. IV). This legislation was designed to authorize the Attorney General to initiate civil rights actions on behalf of institutionalized persons. § 1997a. The Act also placed certain limits on the existing authority of the Attorney General to intervene in suits begun by institutionalized persons. See § 1997c. In addition, in § 1997e, the Act sets forth an exhaustion requirement but only for § 1983 claims brought by prisoners.

On the basis of the exhaustion provision in § 1997e, and remarks primarily by Representative Kastenmeier, the Court contends that Congress has endorsed a *general* no-exhaustion rule. The irony in this reasoning should be obvious. A principal concern that prompted the Department of Justice to support, and the Congress to adopt, § 1997e was the vast increase in § 1983 suits brought by state prisoners in federal courts. There has been a year-by-year increase in these suits since the mid-1960's. The increase in fiscal 1981 over fiscal 1980 was some 26%, resulting in a total of 15,639 such suits filed in 1981 as compared with 12,397 in 1980. The 1981 total constituted over 8.6% of the total federal district court civil docket. Although most of these cases present frivolous claims, many are litigated through the courts of appeals to this Court. The burden on the system fairly can be described as enormous with few, if any, benefits that would not

be available in meritorious cases if exhaustion of appropriate state administrative remedies were required prior to any federal-court litigation. It was primarily this problem that prompted enactment of § 1997e.[21]

Moreover, it is clear from the legislative history that Congress simply was not addressing the exhaustion problem in any general fashion. The concern focused on the problem of prisoner petitions. The new Act had a dual purpose in this respect. In addition to requiring prior exhaustion of adequate state remedies, Congress wished to authorize the Attorney General to act when necessary to protect the constitutional rights of prisoners, but at the same time minimize the need for federal action of any kind by requiring prior exhaustion. Both sponsors of the Act in the Senate made this clear. Senator Hatch explained § 1997e as follows:

> "In actions relating to alleged violations of the constitutional rights of prisoners, such persons may be required to exhaust internal grievance procedures *before the Attorney General can become involved pursuant to [the Act]*." 126 Cong. Rec. 3716 (1980) (emphasis added).[22]

Senator Bayh, the author of the Act, described the exhaustion provision in similar terms:

---

[21] The exhaustion requirement in § 1997e only becomes effective if the Attorney General or a federal district court determines that the available prison grievance procedures comply with standards set forth in subsection (b) of § 1997e. As of this date, the Department of Justice has not certified the inmate grievance procedures of even a single State.

[22] Senator Hatch offered the same explanation on several other occasions in the course of the debate. See 126 Cong. Rec. 9227 (1980) ("Section 7 would establish specific procedures that would be applicable before the Attorney General could enter into an action in behalf of an imprisoned or incarcerated person. Such person would first have had to fully exhaust all internal grievance mechanisms that existed in the institution in which he was confined"); *id.*, at 10005 ("Section 7(D) further clarifies that the administrative grievance procedures established in section 7 are only for the purposes of requiring prisoners to exhaust internal grievance mechanisms before the Attorney General can litigate on his behalf").

"[I]n the event of a prison inmate's rights being alleged to be violated . . . then before the Justice Department could intervene 'or initiate' suits, the prison inmate or class of inmates would have to pursue all of their administrative remedies within the State law before the Justice Department could intervene under the provisions of [the Act]." *Id.*, at 3970.

In short, in enacting the Civil Rights of Institutionalized Persons Act Congress was focusing on the powers of the Attorney General, and the particular question of prisoners' suits, not on the general question of exhaustion in § 1983 actions. Also revealing as to the limited purpose of § 1997e is Congress' consistent refusal to adopt legislation imposing a general no-exhaustion requirement. Thus, for example, in 1979, a bill was introduced into the Senate providing:

"No court of the United States shall stay or dismiss any civil action brought under this Act on the ground that the party bringing such action failed to exhaust the remedies available in the courts or the administrative agencies of any State." S. 1983, 96th Cong., 1st Sess., § 5 (1979).

The bill was never reported out of committee.

The requirement that plaintiffs exhaust available and adequate administrative remedies—subject to well-developed exceptions—is firmly established in virtually every area of the law. This is dictated in § 1983 actions by common sense, as well as by comity and federalism, where adequate state administrative remedies are available.

If the exhaustion question were properly before us, I would affirm the Court of Appeals.