Sixta L. OROZCO by her next friend Margarita ARROYO, Plaintiff,

v.

Thomas SOBOL, Individually and as Commissioner of the New York State Department of Education; and Mount Vernon Board of Education; and Dr. William C. Prattella, Individually and as Superintendent of Schools for the City School District of the City of Mount Vernon; and Joseph Williams, Individually and as Attendance Officer of the City School District of the City of Mount Vernon; and Yonkers Board of Education, Dr. Donald Batista, Individually and as Superintendent of the City School District of the City of Yonkers; and Jerry Frank, Individually and as Court Liaison Officer of the City School District of the City of Yonkers, Defendants.

No. 87 Civ. 6822 (GLG).

United States District Court, S.D. New York.

Nov. 30, 1987.

Westchester Legal Services, Inc., White Plains, N.Y., for plaintiff; Gerald A. Norlander, Julie A. Mills, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendant Thomas Sobol, Com'r; Stephen M. Jacoby, Asst. Atty. Gen., of counsel.

D'Andrea & Goldstein, Mount Vernon, N.Y., for defendants Mount Vernon Bd. of Educ., Dr. William C. Prattella, and Joseph Williams; Robert Goldstein, of counsel.

Anderson, Banks, Moore & Hollis, Yonkers, N.Y., for defendants Yonkers Bd. of Educ., Dr. Donald Batista, and Jerry Frank; Lawrence W. Thomas, of counsel.

## OPINION

GOETTEL, District Judge:

This case is an outgrowth of the myriad of problems confronting our society due to homelessness in America. The immediate issue before this court is deciding the appropriateness of granting a preliminary injunction directing either the Yonkers or Mount Vernon School District to admit a seven year old homeless[1] child into their school system. Although the best interests of the child occupy our principal attention, we are mindful that the case is rife with difficult questions of policy and constitutional law, with profound implications for the Federal judiciary. Similar cases previously have been before the Federal courts, but the case at bar presents certain unique concerns that will become clear as we develop our decision.

### I. FACTS

Plaintiff, Sixta Orozco, a United States citizen, was born on November 29, 1980 in Puerto Rico. Plaintiff and her mother, Margarita Arroyo, left Puerto Rico several years ago and lived for a period of time in Mount Vernon, New York. At some point, they returned to Puerto Rico, and plaintiff attended first grade at a public school in San Lorenzo.

In May of 1987, for personal reasons, Ms. Arroyo again left Puerto Rico. She and her daughter returned to New York, spending the night of their arrival (May 18) with friends in Mount Vernon. The following day, Ms. Arroyo applied for public assistance with the Westchester County Department of Social Services ("DSS"). Her case was accepted, and DSS immediately provided the family with emergency housing at the Trade Winds Motel in Yonkers, New York. The family remains at that location.

Despite the fact that the family, at least temporarily, resides in Yonkers, Ms. Arroyo claims contacts with Mount Vernon and hopes to find permanent residence there. Consequently, she sought to enroll her daughter in the Mount Vernon school system. In August, she contacted the cen-

---

1. Our use of the term "homeless" is consistent with the definition supplied under the Stewart B. McKinney Homeless Assistance Act, Pub.L. No. 100–77, § 103(a), 101 Stat. 482, 485 (1987) (to be codified at 42 U.S.C. § 11302(a)), which provides in pertinent part: "[T]he term 'homeless' or 'homeless individual' includes—(1) an individual who lacks a fixed, regular, and adequate nighttime residence; and (2) an individual who has a primary nighttime residence that is—(A) a supervised publicly or privately operated shelter designed to provide temporary living accommodations (including welfare hotels ...)...."

tral offices of the Mount Vernon Board of Education. Ms. Arroyo maintains that unnamed employees of the Mount Vernon Board advised her that plaintiff could enroll at the Hamilton Elementary School in Mount Vernon. On September 9, Ms. Arroyo went to the Hamilton School to register her daughter for classes, but apparently was told that plaintiff could not be registered since the family resided in Yonkers, not Mount Vernon. Ms. Arroyo returned to the central offices of the Mount Vernon Board, and this time was directed to contact the Yonkers Board of Education.

It appears that no "hearing," however minimal, was held and that no written notice was provided to Ms. Arroyo explaining the basis of the decision and her options. Those options include the right to appeal the local decision to the State commissioner of education pursuant to N.Y.Educ.Law § 310 (McKinney 1969 & Supp.1987) ("section 310").[2] On the other hand, Ms. Arroyo must have understood that the reason for Mount Vernon's decision was that DSS was sheltering her and her child in Yonkers and not in Mount Vernon.

On September 10, Ms. Arroyo contacted the Yonkers Board of Education. An unnamed employee of the Board apparently advised her that, because the family did not permanently reside in Yonkers, plaintiff could not be enrolled in the Yonkers school system. She did not make a more formal application and no hearing or notice was provided to Ms. Arroyo.

A caseworker for the DSS then contacted defendants Joseph Williams, Attendance Officer for the Mount Vernon School District, and Jerry Frank, Court Liaison Officer for the Yonkers School District. Each advised the caseworker that the plaintiff belonged in the other's school system.

At that point, rather than filing an appeal with the commissioner of education pursuant to section 310, plaintiff (by her attorney, the Westchester Legal Services, Inc.) filed a complaint with this court on September 22 under 42 U.S.C. § 1983, alleging various violations of her fourteenth amendment rights to due process of law and equal protection under the law. Plaintiff immediately moved for a temporary restraining order and preliminary injunction (1) directing that Mount Vernon school officials temporarily enroll plaintiff in the Mount Vernon school system and (2) directing that the commissioner of education hold a hearing on plaintiff's case and render a decision as to which school district, Mount Vernon or Yonkers, should officially enroll plaintiff.

On September 24, we granted a temporary restraining order directing that plaintiff immediately be registered in the Yonkers school system. That order was extended by stipulation of the parties, and so ordered by this court, until November 20, the date set for oral argument on the present motion. On November 20, we ordered that plaintiff be allowed to remain in the Yonkers school system pending our decision on the motion, which was agreed to by the Yonkers School District. We now consider plaintiff's request for a preliminary injunction and, for the reasons that follow, grant a preliminary injunction extending plaintiff's enrollment in the Yonkers school system until the merits of this case are decided, but deny plaintiff's request for injunctive relief against the State commissioner of education.

## II. DISCUSSION

The standards for injunctive relief in this circuit are well established. Plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2)

---

**2.** Section 310 provides in pertinent part:

Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under this article. The petition may be made in consequence of any action:

\* \* \* \* \* \*

7. By any other official act or decision of any officer, school authorities, or meetings concerning any other matter under this chapter, or any other act pertaining to common schools.

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

There can be no doubt that plaintiff could suffer irreparable harm if she is denied attendance at a New York public school. "[I]nterruption of a child's schooling[,] causing a hiatus not only in the student's education but also in the other social and psychological development processes that take place during the child's schooling, raises a strong possibility of irreparable injury." *Ross v. Disare,* 500 F.Supp. 928, 934 (S.D.N.Y.1977). We agree with plaintiff's counsel that this possibility is heightened even further when, as here, the child is likely to receive little or no home instruction. Public schooling will provide this plaintiff with a crucial and desperately-needed foundation. Among other things, the plaintiff is not fluent in English, which is a substantial handicap to immigrants and Puerto Ricans. The educational and social maturity she loses, forfeited as a result of forces well beyond her control, could constitute irreparable harm under any reading of that terminology.

It is in satisfying the second prong of the *Jackson Dairy* test whereby plaintiff seeks to send this court into uncharted and potentially hostile waters. Although this court will not shirk its duty and responsibility to protect individual rights, we have determined it best to tread warily in this case. As the Supreme Court wisely cautioned:

> Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.

*Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

If injunctive relief is proper, as against either the local school districts or the State, plaintiff must show a likelihood of success on the merits or, at a minimum, sufficiently serious questions going to the merits that injunctive relief is warranted in light of the hardships tipping in her favor. Notwithstanding a spurious equal protection claim (which we understand plaintiff wisely intends to delete via amended complaint), the crux of the merits center on alleged violations of the Due Process Clause of the fourteenth amendment.[3]

■ In determining "whether due process requirements apply in the first place, we must look ... to the *nature* of the interest at stake." *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972) (emphasis in original). Here, the New York Constitution expressly directs that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein *all of the children of this state* may be educated." N.Y. Const. art. XI, § 1 (emphasis added). Although there is considerable debate in this case as to what constitutes plaintiff's *legal* residence, there can be no doubt that, as an eligible recipient of public assistance from the Westchester County DSS, plaintiff *actually* resides in New York and is a child of this State. As such, she is entitled to a free public education under the New York Constitution, a property right that can not be abridged or extinguished without plaintiff first being accorded the protections afforded by due process. Indeed, none of the defendants contests this fact. As the Supreme Court concluded in a similar though distinguishable case in language adaptable to the instant facts:

> Although [New York] may not be constitutionally obligated to establish and maintain a public school system, [*San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 35, [93 S.Ct. 1278, 1297, 36 L.Ed.2d 16] (1973),] it has neverthe-

---

3. The Due Process Clause provides: "... nor shall any State deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1.

less done so.... [Accordingly,] the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause.... *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975).[4]

Having determined that plaintiff is entitled to due process protection, we are left with the more difficult questions in this case of how much process is due and who must provide it. Although, at this stage, we need not definitively resolve these issues, we must, at a minimum, satisfy ourselves as to the sufficient seriousness of these questions, and balance the relevant hardships, if injunctive relief is to issue against any or all of the defendants.

### The Local School Districts

 Plaintiff argues that the local school districts must provide her with a hearing and notice of their decision, including identification of appellate rights, pursuant to *Goss v. Lopez* and *Takeall v. Ambach,* 609 F.Supp. 81 (S.D.N.Y.1985). In *Goss,* the Supreme Court held that where disciplinary action will result in a student's suspension from school, the student is entitled to the minimum due process protections of notice and hearing. *Goss,* 419 U.S. at 579, 95 S.Ct. at 738. If suspension from school triggers due process protection, plaintiff argues, then surely local school districts must provide notice and hearing if they are to deny a prospective student admission to school altogether. We do not find that argument compelling. Certainly, if plaintiff had been enrolled in the Mount Vernon or Yonkers school system, her removal from school would trigger, at a minimum, *Goss*-like protection. Such is not the case. Plaintiff sought admission to a school, but had not yet been admitted to any school.

In that vein, plaintiff does not have an unfettered right to a tuition-free education at *any* public school in New York. Indeed, if that were so, local school districts would have to provide notice and hearing to any prospective student seeking admission, for whatever reasons, to a given school. Instead, plaintiff's right is limited by a residency requirement embodied in N.Y. Educ.Law § 3202(1) (McKinney 1981), which provides in pertinent part: "A person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without the payment of tuition." The question, therefore, is squarely presented. What type of hearing should be conducted, and by whom, in settling an inter-district dispute over establishing plaintiff's residency under N.Y. Educ.Law § 3202?

The position of the parties may be summarized as follows. Mount Vernon points out that the plaintiff and her mother have not resided in that town for some years and that a one-night stopover on her return from Puerto Rico can scarcely premise any obligation on its part. Yonkers argues that the plaintiff and her mother are physically within its bounds through the choice of DSS and that they do not intend or wish to remain there. The commissioner maintains that one of the school districts is wrong, but he is not prepared to say which unless a section 310 appeal is filed and he is allowed to proceed to a quasi-judicial determination. The plaintiff argues that such a procedure is too slow and burdensome to satisfy due process.

Plaintiff's purported remedy to the situation, a hearing and written notice requirement, although a convenient due-process hook by which to involve the Federal courts, is in fact no solution to the plaintiff's problem at all. There do not appear to be any disputed facts requiring a hearing. The positions of the defendant school districts are well known to the plaintiff, and putting them in writing accomplishes little. The simple remedy, at least for this plaintiff, is a directive or ruling from the commissioner settling the inter-district dispute.

---

**4.** Although less clear in this case, liberty interests may also be implicated. *See Goss,* 419 U.S. at 574–75, 576, 95 S.Ct. at 737 (holding liberty interests implicated by school suspensions).

No guidelines exist to aid school districts in settling these disputes; neither the State legislature nor the State Department of Education has acted to fill this void. Local school districts are left to fend for themselves on an ad hoc basis, leaving aggrieved students and their families with the responsibility of appealing to the commissioner of education pursuant to N.Y. Educ.Law § 310, *supra* note 2. Of course, if those same students and families are not apprised of this appellate right, one is left wondering how it can be exercised.

The failure of legislative and/or regulatory leadership on this issue is at the center of this action. Perhaps in this age when legislators won't legislate and regulators won't regulate, preferring instead to spend their time carping at Federal judges who ultimately must step into the breach to protect individual rights from the capriciousness of ad hoc decision making, one should not be surprised at this state of affairs. On the other hand, it sadly leaves the goal of judicial restraint as a forgotten dream as we are forced to devote our energies full time to safeguarding constitution-

ally-protected rights from being sucked up in the vacuum of legislative and regulatory dereliction.

This court is all too directly and keenly aware of the thorny policy choices this case, and others like it, present. We also recognize that legislative haste can make political waste; but plaintiff and the hundreds (or thousands) like her do not have the luxury of waiting for that slumbering giant in Albany to work its will.[5] Although we can not and need not say with certainty at this stage that a hearing is the constitutionally-mandated solution, nor do we need now resolve who has the initial responsibility for holding such a hearing, these certainly are sufficiently serious questions going to the merits, and the hardships tip so very decidedly in plaintiff's favor, that preliminary injunctive relief against one of the local school districts is warranted. Although *Takeall v. Ambach* appears to have involved a student who, like *Goss*, was already within the school district's control before his dismissal,[6] the applicability of *Takeall* (which required a local school dis-

---

**5.** On July 22 of this year, the Stewart B. McKinney Homeless Assistance Act, Pub.L. No. 100–77, 101 Stat. 482 (1987) (to be codified at scattered sections of the U.S.C.), was enacted. Title VII of that Act directs each State to adopt a plan providing for the education of homeless children within its borders, such plan to include "procedures for the resolution of disputes regarding the educational placement of homeless children and youth." *Id.* at § 722(e)(1)(B), 101 Stat. at 526. The statute notes that "the causes of homelessness are many and complex" and that "there is no single, simple solution." *Id.* at § 102(a)(3) & (4), 101 Stat. at 484. The defendant commissioner cites this language as a means of explaining State legislative and regulatory delays on this issue.

No matter how complex or difficult the issues, this court, and, more importantly, the plaintiff, can not sit idly by when fundamental, constitutional rights are at jeopardy. Further, Albany hardly needed to be told by the United States Congress that there were problems associated with ensuring the education of the homeless that needed solutions. State officials have been aware generally of these problems since (at the latest) *Vaughn v. Board of Educ. of Union Free School Dist. No. 2,* 64 Misc.2d 60, 314 N.Y.S.2d 266 (Sup.Ct.1970). We are advised by counsel that in response to this court's decision in *Takeall v. Ambach,* 609 F.Supp. 81 (S.D.N.Y.1985), legislation specifically addressing inter-district

residency disputes was introduced in the New York State legislature. Over seventeen years after *Vaughn,* and two and one-half years after *Takeall,* we are again confronted with a similar case, and still there are no guidelines. We would prefer that the legislature or the commissioner act to fill this void. Today's decision will provide further time for action; hopefully it will also provide the impetus.

**6.** The *Takeall* facts suggest that the plaintiff, resident of a group home in White Plains, had received tacit admission into the White Plains school system, with the system's Committee on the Handicapped then charged with deciding on an appropriate placement. *Takeall,* 609 F.Supp. at 83. On September 29, five months after plaintiff first contacted the White Plains school system about enrolling, the Committee determined that plaintiff was emotionally disturbed and should be placed in the New York Hospital program. *Id.* In the interim, it appears plaintiff had moved out of the group home and into the home of an unrelated adult. *Id.* It was not until October 7, and after this later move by plaintiff, that the White Plains Board of Education decided, without sufficient notice and hearing, that the plaintiff was not a resident of White Plains for purposes of N.Y.Educ.Law § 3202. *Id.* The plaintiff in the case at bar has not been admitted, tacitly or otherwise, to either the Mount Vernon or Yonkers school system.

trict to provide notice and hearing before excluding a student on grounds of non-residency) to the instant case is a serious question going to the merits. At this stage, however, without the benefit of a full hearing on the merits, we decline to direct a local school district(s) to provide plaintiff with notice and hearing on the residency question.

■ In the interim, until the merits are reached, a preliminary determination permitting plaintiff to attend school must be made. This case is unlike *Matter of Richards*, 25 Ed.Dep't Rep. 38 (July 17, 1985), which addressed residency in the context of students who were established New York residents and already members of a school district and then became homeless. Likewise, traditional legal concepts used to establish legal domicile—physical presence coupled with an intent to remain indefinitely—are unavailing since, whatever the family's intent, Westchester County DSS largely will control the locus of plaintiff's residence.[7] When we granted the temporary restraining order in this case, we believed it more likely that plaintiff would be able to establish residency for school attendance purposes in Yonkers, rather than Mount Vernon. We continue to adhere to that view. As noted, regardless of her desire to live in Mount Vernon, Ms. Arroyo's situation is controlled largely by the DSS and where they place her. We believe, therefore, that in this case the DSS placement should operate presumptively as plaintiff's legal residence. Accordingly, we grant a preliminary injunction, but against the Yonkers, and not the Mount Vernon, School District. We direct the Yonkers School District to continue to educate plaintiff tuition-free, as long as the family continues to live under current or similar conditions in Yonkers, until the merits of this case are decided.

### The Commissioner of Education

■ Plaintiff next seeks a preliminary injunction against the State commissioner of education, initially on the ground that the section 310 appeals procedure is far too complex, burdensome, and time-consuming to satisfy any reasonable standard of due process. Plaintiff, however, has not availed herself of the section 310 process; she instead filed a section 1983 claim with this court. This initial claim against the State, therefore, is based on speculation and may not be ripe for adjudication. *United Public Workers v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 564–65, 91 L.Ed. 754 (1947). Just as importantly, there is a serious question whether plaintiff has standing to bring a section 1983 claim against the State on this ground. Plaintiff has not suffered actual injury as a result of a section 310 appeal since one has not yet been initiated. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982) (discussing constitutional underpinning for "actual injury" standing requirement). Consequently, there is a serious question as to whether a "case" or "controversy" has been presented to the court on the section 310 question. U.S. Const. art. III, § 2.[8]

---

7. We note parenthetically, but interestingly, that Westchester County DSS, which obviously plays a great role in this whole scenario, is not a party to this suit.

8. Plaintiff's reply brief on the instant motion correctly argues that she need not exhaust State judicial or administrative remedies before pursuing a section 1983 remedy. *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961); *Patsy v. Board of Regents*, 457 U.S. 496, 515, 102 S.Ct. 2557, 2567, 73 L.Ed.2d 172 (1982). Plaintiff's reliance on these rules as a shield against ripeness or standing objections misconstrues, we think, the applicability of those holdings in this case. Plaintiff initially challenges the local school districts' decisions denying her admission, claiming those actions fail to meet due process standards. To the extent plaintiff meets the "case" and "controversy" requirements of article III and satisfies related jurisprudential considerations, *Valley Forge*, 454 U.S. at 471–76, 102 S.Ct. at 757–61, we would violate the mandates of *Monroe* and *Patsy* if we were to decline jurisdiction over that claim on an exhaustion theory. Whatever the commissioner's authority in this case, it remains at all times the prerogative of this court to determine the constitutionality of the actions taken by the local school districts. That is distinguishable from plaintiff's second claim that the section 310 appeal process, of which she has yet to avail herself, also is violative of due

We recognize that plaintiff must clear many hurdles to sustain an action in Federal court, and we suspect that her counsel has not initiated a section 310 appeal in an attempt to sidestep altogether one such hurdle—mootness. Had plaintiff initiated a section 310 appeal when this case was filed (September 22), a decision from the commissioner would surely have by now been rendered—no matter how flawed or imperfect the process—thereby *potentially* mooting plaintiff's claim against the State. *Cf.* M. Schwartz & J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 13.5 (1986) (discussing mootness and "capable of repetition, yet evading review" exception).

Given the fact that our earlier grant of injunctive relief protects plaintiff from whatever irreparable harm may attach pending review of this case on its merits, and mindful of our need to tread warily, *Epperson,* 393 U.S. at 104, 89 S.Ct. at 270, (cited in full *supra*), we think the balance of hardships weighs heavily against this request. This is particularly so when a grant of injunctive relief may have the effect of scuttling an administrative plan that has not yet been tested by this plaintiff. When regulators do regulate, we should avoid interposing our will without concrete evidence of the regulation's constitutional failings.

Apparently in recognition of this potential weakness, and in furtherance of the broader agenda clearly afoot here,[9] plaintiff's counsel sought at oral argument on the instant motion to shift the focus of the injunctive claim against the State. Plaintiff now asks that we direct the commissioner, and not the local school districts, to hold the initial hearing in a potential interdistrict dispute—this despite the fact that the complaint itself makes clear that plaintiff seeks declaratory injunctive relief against the State for failure to establish an adequate mechanism to review residency determinations *after* initial hearings by local school districts.[10] Again, we hasten to emphasize that our earlier grant of injunctive relief against the Yonkers School District protects the plaintiff from further harm pending a decision on the merits. Given that fact, and for policy reasons previously highlighted, we are especially reluctant, on a request for a preliminary injunction, to effectively construct via judicial caveat a new regulatory scheme to deal with these issues.

At oral argument on the instant motion, plaintiff offered a convoluted hodgepodge of possible injunctive remedies against the State. Any relief that this court might provide which will operate as an end run on the legislative and regulatory processes must be better thought out. Thus, we

process. Suggesting that this separate and distinct claim may not comport with the "case" and "controversy" requirements of article III is not akin to requiring an exhaustion of administrative remedies—it goes to the very substance of this second claim. We confidently can assure plaintiff that *Monroe* and *Patsy,* whatever else their implications, do not vitiate the "case" and "controversy" requirements of article III of the Constitution.

**9.** We note here our concern that in serving this broader agenda, counsel may not be serving adequately plaintiff's needs. A servant to two masters serves neither well. Although plaintiff's counsel may feel the need to seek social reform through Federal litigation (which appears to have become a customary vehicle in the last thirty years), we remind them that an attorney's first allegiance must be to the interests of the client.

**10.** The notice of motion is somewhat ambiguous. It asks for a preliminary injunction enjoining the collective defendants from excluding plaintiff "without first providing plaintiff adequate written notice of the factual and legal basis [sic] for any proposed denial of educational services, *and* without first providing plaintiff and her parent an opportunity for an evidentiary hearing and final decision on her request for admission to school by the New York State Commissioner of Education." (Emphasis added.) Not only is it somewhat unclear as to which of the collective defendants is responsible for providing the "adequate written notice" requested, it also is unclear which form of relief actually is to be "first provid[ed]" if both are to be "first provid[ed]." We might add, however, that this is typical of plaintiff's "birdshot approach" to the motion; *i.e.,* try to cover as much area as possible with one blast. As should seem obvious at this point, we decline plaintiff's invitation to join in the hunt on a motion for preliminary injunctive relief, choosing instead for the reasons articulated to tailor more narrowly the preliminary remedy.

think it prudent to deny this request and wait for a full hearing of the issues.[11]

Of course, it may never get that far. The commissioner puts forth a plethora of constitutional barriers to plaintiff's claims, ranging from administrative immunity, to the eleventh amendment, to abstention. The State's attorney advises the court that a motion to dismiss plaintiff's claims against the commissioner will be forthcoming, so several of these issues are likely to be resolved in due course. Although we intimate no prejudice to plaintiff's claims against the State, and in light of the fact that plaintiff is protected from irreparable harm by virtue of our preliminary injunction against the Yonkers School District, we think the above considerations militate *against* a grant of injunctive relief directed to the State on the grounds asserted.

### CONCLUSION

For all of the foregoing reasons:

(1) preliminary injunctive relief against the Yonkers School District is granted, and the District is directed to continue plaintiff's education, as long as the family continues to live under current or similar conditions in Yonkers, until the merits of this case are decided; and

(2) plaintiff's request for preliminary injunctive relief against the State commissioner of education is denied.

SO ORDERED.

11. We continue to believe that the most effective solution to the problem here presented is legislation or the promulgation by the commissioner of regulations or guidelines which will at least presumptively govern these inter-district school disputes. Although section 310 appeals may be necessary in some cases, a straightforward situation, such as we have here, should be determinable by published regulations.