**Robert BONGIORNO, Plaintiff,**

v.

**Santo LALOMIA, as Chairman, Samuel M. Cannella, Peter Cofrancesco, Oliver R. Kovacs, William E. McGlynn, Daniel A. Monaco, Frank Orechio, as Commissioners and Francesco Zanzuccki, as Executive Director of the New Jersey Racing Commission, Defendants.**

**Jeffrey LA POFF, Plaintiff,**

v.

**Santo LALOMIA, as Chairman, Samuel M. Cannella, Peter Cofrancesco, Oliver R. Kovacs, William E. McGlynn, Daniel A. Monaco, Frank Orechio, as Commissioners and Francesco Zanzuccki, as Executive Director of the New Jersey Racing Commission, Defendants.**

**Rosemary SMUTZ, Plaintiff,**

v.

**Santo LALOMIA, as Chairman, Samuel M. Cannella, Peter Cofrancesco, Oliver R. Kovacs, William E. McGlynn, Daniel A. Monaco, Frank Orechio, as Commissioners and Francesco Zanzuccki, as Executive Director of the New Jersey Racing Commission, Defendants.**

**Steven ELLIOTT, Plaintiff,**

v.

**Santo LALOMIA, as Chairman, Samuel M. Cannella, Peter Cofrancesco, Oliver R. Kovacs, William E. McGlynn, Daniel A. Monaco, Frank Orechio, as Commissioners and Francesco Zanzuccki, as Executive Director of the New Jersey Racing Commission, Defendants.**

**Jordon RUBIN, Plaintiff,**

v.

**Santo LALOMIA, as Chairman, Samuel M. Cannella, Peter Cofrancesco, Oliver R. Kovacs, William E. McGlynn, Daniel A. Monaco, Frank Orechio, as Commis-**

sioners and Francesco Zanzuccki, as Executive Director of the New Jersey Racing Commission, Defendants.

Nos. Civ. 94–535(NHP) to Civ. 94–538(NHP).

United States District Court, D. New Jersey.

May 3, 1994.

William M. Kunstler, New York City, Alicia D. Bass, Jersey City, NJ, for plaintiffs.

Sherrie L. Gibble, Deputy Atty. Gen., Deborah T. Poritz, Atty. Gen. of N.J., Div. of Law, Trenton, NJ, for defendants.

### ORDER

POLITAN, District Judge.

This matter having come before the Court on plaintiffs' applications for stays of the orders of the New Jersey Racing Commission suspending plaintiffs' harness race horse trainers licenses pending final resolution of the instant cases, and the Court having reviewed the submissions of the parties and having heard oral argument thereon, and for the reasons more fully explained in the accompanying Letter Opinion dated May 3, 1994, and for good cause shown,

IT IS on this 3rd day of May, 1994,

**ORDERED** that this Court will abstain from deciding the Constitutional claims raised by plaintiffs pursuant to the *Younger* abstention doctrine. Because plaintiffs' claims for monetary damages cannot be resolved in the state judicial proceedings, the Court will stay and administratively terminate the federal actions pending final decision by the New Jersey Supreme Court on the Constitutional issues raised in plaintiffs' state court appeals. At such time as the New Jersey Supreme Court decides the appeals, plaintiffs may return to this Court to litigate their claims for monetary damages.

**SO ORDERED.**

## APPENDIX

### *LETTER OPINION ORIGINAL ON FILE WITH CLERK OF THE COURT*

Dear Counsel:

■ This matter comes before the Court on plaintiffs' applications for stays of the orders of the New Jersey Racing Commission suspending plaintiffs' harness race horse trainers licenses pending final disposition of the instant cases.[1] For the reasons explained herein, this Court will abstain from reaching the merits of plaintiffs' applications pursuant to the *Younger* abstention doctrine.[2]

1. In this Letter Opinion the Court addresses the applications for stays made by plaintiffs in the five above-captioned cases. Because the factual backgrounds and legal issues presented by each of the cases are similar, the Court finds it appropriate to address all of the applications in one opinion.

2. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* abstention is appropriate where: (1) state judicial proceedings are ongoing; (2) important state interests are implicated; and (3) there is an adequate opportunity to raise constitutional challenges in the state proceedings. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).

3. Fernspiride is essentially an uncontrolled, unknown substance. Prior to the testing which led to the positive results in the instant cases, fern-

## PROCEDURAL BACKGROUND/STATEMENT OF FACTS

Plaintiffs are each licensed to drive, train and own harness race horses by the New Jersey Racing Commission ("NJRC"). In September and October of 1993, the Board of Judges of the NJRC at the Meadowlands Racetrack issued rulings against each plaintiff imposing a $500 fine and period of suspension for each trainer as follows: Bongiorno—three years from 10/9/93 through 10/8/96; Smutz—four years from 10/26/93 through 10/25/97; Elliott—four years from 10/15/93 through 10/14/97; LaPoff—six years from 10/15/93 through 10/14/99; and Rubin—two years days from 10/9/93 through 10/8/95. The disciplinary actions arose out of test results from the New Jersey Equine Testing Laboratory indicating that urine samples from horses under the care and control of each trainer tested positive post race for a drug called fernspiride[3] in violation of N.J.A.C. 13:71–23.1 and –23.6. Allegedly, prior to rendering the decisions, defendant Frank Zanzuccki, Executive Director of the NJRC, contacted the Chief Judge and indicated that a two-year suspension should be imposed for one post race fernspiride positive with an additional year suspension for each additional positive test. The decisions of the Board of Judges were appealed to the Office of Administrative Law ("OAL").[4]

Zanzuccki denied each trainer's subsequent request for stays of the suspension pending final decision. Rubin unsuccessfully

spiride was undetectable. According to the report of the NJRC, anecdotal evidence suggests that fernspiride may be a bronchodilator, or in other words a performance enhancing drug. Based upon the anecdotal evidence and apparent widespread use of the drug in recent years, the NJRC inferred that the presence of the drug was "nefarious and deceitful." The NJRC cited with approval to the Administrative Law Judge's conclusion that " 'whoever administered the drug to these horses was under the impression that it is a bronchodilator and therefore a performance enhancer ...' " *See* Decision of the NJRC in the matters of Elliott, LaPoff, Smutz, and Bongiorno dated 1/6/94 at 5.

4. Pursuant to N.J.A.C. 13:71–3.3, the appeals of the rulings of the Board of Judges could have been heard by the state Steward. The decision of the State Steward would then be appealable to the OAL. There is no indication as to why the appeals to the Steward were bypassed and made in the first instance to the OAL.

appealed the denial of the stay in a series of appeals culminating in the New Jersey Supreme Court. The Appellate Division of the Superior Court, however, directed the NJRC to complete the proceedings before December 31, 1993. LaPoff and Elliott also filed appeals from the denials of the stays to the Appellate Division. On October 22, 1993, the Appellate Division issued an order reversing Zanzuccki's denial stays and directed the NJRC to complete the proceedings prior to December 31, 1993. Thereafter the New Jersey Supreme Court vacated the stays but affirmed the deadline for completion of the proceedings.

The matters of Elliott, LaPoff, Smutz, and Bongiorno were consolidated for hearing before Administrative Law Judge ("ALJ") M. Kathleen Duncan. The matter proceeded to hearing before ALJ Duncan. ALJ Duncan found, based upon the evidence before her, that each of the urine samples contained the substance fernspiride. ALJ Duncan then proceeded to discuss the appropriate penalty. ALJ Duncan first conducted a review of the penalty ranges for post race positives from 1981 through 1993. Furthermore, the ALJ acknowledged that the Association of Racing Commissioners International had promulgated "Recommended penalties and model rules" [hereinafter "RCI guidelines"]. The RCI guidelines categorize various substances into classifications. Depending upon the classification, the suggested penalties will vary. Fernspiride is not recognized in any of the classifications.

Although the NJRC neither adopted the guidelines nor promulgated its own rules or guidelines, the ALJ acknowledged that the NJRC had issued at least one directive which refers authoritatively to the RCI guidelines with regard to post race test positives for cocaine. After review of the past penalties, the RCI guidelines, and the records of the trainers, the ALJ ordered a six month suspension for each first reported post race positive of fernspiride with an additional four months for each subsequent positive finding. The penalty range imposed by the ALJ was reached, in part, by considering fernspiride to be a Category 3 drug within the RCI guidelines.

Rubin's case was heard separately before ALJ J. Roger Persichilli. ALJ Persichilli similarly found that Rubin was in violation of N.J.A.C. 13:71–23.1 and –23.6 as a result of the post race positive of fernspiride in a horse under the care of Rubin. In proceeding to the penalty phase, the ALJ determined that as a result of the bypass of the appeal to the Steward in addition to alleged improper communication between Zanzuccki and the Board of Judges, the opportunity to consider mitigating factors never existed. A review of Rubin's prior record persuaded the ALJ that the record mitigated the penalty not aggravated it. Additionally, the ALJ was guided in part by the NJRC's treatment of post race positives for cocaine in accordance with the RCI guidelines and by New York's 120 day suspension for post race fernspiride positives. The ALJ found it "grossly disproportionate" to impose a two year penalty for a drug that is not a controlled dangerous substance. For these and other reasons stated in his opinion, the ALJ determined that the penalty should not have exceeded four months.

Following the decisions of the ALJs, the matters were forwarded to the NJRC for final review. The NJRC determined that the ALJs' decisions should be modified insofar as the penalties were upgraded to 18 months for the first post race positive of fernspiride plus 12 months for each subsequent instance wherein a post race positive for fernspiride was found. In making this determination, the NJRC stressed the gravity of the offenses involved and the paramount importance of protecting the integrity of horse racing in general. In this regard the NJRC noted the widespread increase in post race positives of fernspiride in the previous two years. As the stated purpose for the concededly harsh penalties, the NJRC cited to the deterrence of future fernspiride use as well as the use of other unknown substances. The NJRC specifically rejected the ALJs' reliance on the RCI guidelines as the NJRC had never officially adopted them nor was fernspiride even listed in them. Nor was the NJRC persuaded that the New York rule had any applicability to the proceeding. In

fact, it was the unknown nature and effect of fernspiride on which the NJRC relied in determining that a severe penalty was warranted.

Following the final decisions of the NJRC, plaintiffs filed the instant Complaints in this Court alleging violations of 42 U.S.C. § 1983. Upon the filing of the Complaints, plaintiffs moved by way of Order to Show Cause why the order of the NTRC suspending plaintiffs' licenses should not be stayed pending the determination of the instant Civil Rights Actions to annul the determinations. On the return date of the Order to Show Cause, plaintiffs' counsel informed the Court that plaintiffs had not as of that time exercised their right to appeal the decisions of the NJRC to the New Jersey Appellate Division. At that time, this Court revealed its concerns regarding the issue of abstention and suggested to plaintiffs' counsel that the prudent course of action would be to file the notices of appeal with the Appellate Division and to seek a stay of the final decisions of the NJRC from the Appellate Division, and if need be, the New Jersey Supreme Court. If the New Jersey courts denied the stay applications, then this Court would consider plaintiffs' requests for stays. Plaintiffs' counsel agreed with the Court's suggestion.

Thereafter, the NJRC immediately considered plaintiffs' applications for a stay of their license suspensions as required by the New Jersey Court Rules as a prerequisite for application to the Appellate Division. The NJRC advised plaintiffs that their applications were denied on February 10, 1994. Notices of Appeals and Motions for Stays were filed by plaintiffs with the New Jersey Appellate Division on February 16, 1994. The Appellate Division denied the motions on February 28, 1994. On March 9, 1994, plaintiffs filed Motions for Stays before the Supreme Court of New Jersey. The Supreme Court denied the motions on March 22, 1994. Thereafter, plaintiffs' counsel notified this Court of the Supreme Court's denial of the stay applications and informed the Court that it wished to proceed with its stay applications in the Civil Rights Actions before this Court. The Court directed the parties to submit supplemental briefs and set the matter down for hearing on April 20, 1994.

## DISCUSSION

Plaintiffs' Complaints were filed pursuant to 42 U.S.C. § 1983. By way of relief, plaintiffs request this Court to annul the determinations suspending plaintiffs' licenses. Furthermore, plaintiffs' request money damages against defendant Zanzuccki. In their Complaints, plaintiffs allege various constitutional infirmities regarding the hearings and procedures which led to the final decision of NJRC. Initially, plaintiffs contend that in each case, prior to the determination of the Board of Judges, defendant Zanzuccki improperly communicated with the judges. Specifically, it is alleged that Zanzuccki directed the judges to find each of the trainers guilty and to suspend each of them for the specified time of two years for the first infraction with one additional year for subsequent infractions. Furthermore, plaintiffs allege that during the course of the administrative proceedings they were denied discovery of a portion of the urine samples such that they could employ their own experts to test for the fernspiride. They also contend that because no evidence was presented by the state to establish the effects of the fernspiride on the horses, the burden of proving the substance not dangerous was impermissibly shifted to plaintiffs. Finally, plaintiffs' contend that their Eighth Amendment guarantee against excessive punishment was violated by reason of the lengthy sentences that will have the effect of destroying their careers.

In response to the pending applications, the State urges this Court to abstain from deciding the case pursuant to the doctrine first set forth in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This Court is persuaded that abstention is warranted in this matter.

*Younger v. Harris, supra,* counsels that the exercise of a court's jurisdiction is constrained by traditional notions of equity, comity, and federalism. *See Gwynedd Properties, Inc. v. Lower Gwynedd Tp.,* 970 F.2d 1195, 1199 (3d Cir.1992). The Court in *Younger* stated that "the National Government, anxious though it may be to vindicate and protect federal interests, always endeavors to do so in ways that will not unduly

interfere with the legitimate activities of the States." *Younger,* 401 U.S. at 44, 91 S.Ct. at 750. *Younger* involved an action wherein the federal plaintiff sought to enjoin a state court criminal proceeding brought against him through resort to the federal courts. In a case decided the same day as *Younger,* the Supreme Court determined that the same considerations that require the withholding of injunctive relief in an ongoing state criminal proceeding are also applicable to a decision to withhold declaratory relief. *See Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (Court declined to decide the constitutionality of state statutes under which federal plaintiffs were indicted where federal plaintiffs had opportunity to raise constitutional claims in the state court criminal proceedings). The Supreme Court subsequently extended *Younger* to noncriminal state court proceedings, including administrative proceedings. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *see also Ohio Civil Rights Comm'n v. Dayton Christian Schools,* 477 U.S. 619, 627, 106 S.Ct. 2718, 2722–23, 91 L.Ed.2d 512 (1986) (reaffirming the applicability of *Younger* abstention to ongoing state administrative proceedings where "important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportunity to litigate his constitutional claim").

The first prerequisite to *Younger* abstention is the existence of an ongoing state judicial proceeding. In *New Orleans Pub. Serv., Inc. v. New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) [hereinafter "*NOPSI*"], the Supreme Court distinguished legislative agency action from judicial or adjudicatory agency action. The Supreme Court stated:

"A judicial inquiry investigates, declares and enforces liabilities as they stand on

present or past facts and under laws supposed to already exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is a making of a rule for the future, and therefore is an act legislative and not judicial in kind...."

*Id.* at 370–71, 109 S.Ct. at 2519–20 (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)).

The Court is satisfied that the administrative proceedings wherein it was determined that the trainers were in violation of N.J.A.C. 13:71–23.1 and –23.6 were judicial in nature rather than legislative. Applying the guidelines set forth in *NOPSI,* there can be no disagreement that the Board of Judges, the ALJs, and the NJRC conducted investigations and held hearings in which the trainers were provided the opportunity to call witnesses and proffer evidence on their behalf and to cross-examine and refute the State's witnesses and evidence. The purpose of the investigations and the hearings was to establish certain past and present facts. Based upon the findings of fact, determinations were made regarding whether those facts resulted in violations of existing rules and/or laws. Upon determining that the trainers were in violation of N.J.A.C. 13:71–23.1 and –23.6 in that an unauthorized foreign substance, fernspiride, was found in the urine of the horses which were trained by the plaintiffs, determinations were made as to the appropriate penalties to be imposed. Thus, the Court is satisfied that the agency actions at issue were "judicial in nature" within the meaning of *NOPSI. NOPSI,* 491 U.S. at 370, 109 S.Ct. at 2519.[5]

Having concluded that the proceedings were "judicial in nature", the Court turns to

**5.** The Court confesses some uncertainty as to plaintiffs' argument regarding the nature of the proceedings as legislative rather than adjudicatory. *See* Plaintiffs' Memorandum of Law in Support of Motion, dated March 30, 1994 at 4. Plaintiffs appear to argue that because the concededly severe penalties were the first to be imposed for post race fernspiride positives, the ulti-

mate effect of plaintiffs' cases was to create a prospective rule regarding penalties for fernspiride. This argument, however, fails to address the essential nature of the proceedings about which plaintiffs complain as judicial.

It is unclear from plaintiffs submissions, as to whether plaintiffs are actually arguing that in creating a penalty for fernspiride the NJRC

the issue of whether an ongoing state proceeding currently exists. In this regard, the Court first notes that plaintiffs have appealed the final decisions of the NJRC and those appeals are currently pending before the New Jersey Appellate Division. At the April 20, 1994 hearing on plaintiffs' applications, counsel for plaintiffs indicated to the Court that the constitutional issues raised in the instant Complaints were also raised in the appeals before the Appellate Division. Accordingly, there can be little doubt that state judicial proceedings are ongoing.

The Court acknowledges plaintiffs' argument that the filing of the state court appeals were at the suggestion of this Court and as such do not necessarily reflect a voluntary invocation of the jurisdiction of the state courts by plaintiffs. Plaintiffs contend that because the state administrative proceedings had concluded at the point in time when plaintiffs first brought their applications before the Court, this Court should now conclude that there is no ongoing state proceeding. Thus, to plaintiffs, the relevant issue is whether for *Younger* abstention purposes, an ongoing state proceeding exists where a state administrative proceeding has concluded, but where a right to appeal the final decision of the agency to the state courts exists. Because the Court answers

that question presented in the affirmative, the Court finds it unnecessary to address plaintiffs' argument that the pending appeals do not reflect a voluntary invocation of the state courts by plaintiffs.

This Court has previously held that an administrative proceeding with a right to appeal to the state court should be treated as one unitary proceeding for *Younger* abstention purposes. *See American Institute of Foot Medicine v. New Jersey State Board of Medical Examiners,* 807 F.Supp. 1170, 1174–75 (D.N.J.1992) [hereinafter *"Foot Medicine"*] (analyzing *Younger* and its progeny). The Court has reexamined its analysis in *Foot Medicine* and is satisfied that its holding remains valid and applicable to the pending cases, especially given the procedural posture presented by these cases. In this regard, the Court emphasizes that the administrative proceedings at issue were enforcement proceedings brought by the State to enforce state laws/rules rather than remedial proceedings initiated by the federal plaintiffs to vindicate their rights. *See Dayton Christian,* 477 U.S. at 627–28 & n. 2, 106 S.Ct. at 2722–23 & n. 2 (recognizing that where state administrative proceeding was coercive rather than remedial *Younger* abstention was appropriate and distinguishing *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)) [6];

should have acted through rulemaking as opposed to adjudication because of the prospective impact of the penalty. As the New Jersey Supreme Court has recognized, where the legislature has proscribed certain conduct, "the administrative agency need not adopt regulations before carrying out its legislative mission." *See In the Matter of C.V.S. Pharmacy,* 116 N.J. 490, 503, 561 A.2d 1160 (1989). In such a situation, an agency is permitted to enforce a statute through adjudication. *Id.; see also Texter v. Department of Human Services,* 88 N.J. 376, 383, 386, 443 A.2d 178 (1982) (recognizing that "courts normally defer to [the] choice [of the agency] so long as the selection is responsive to the purpose and function of the agency").

In the instant case, the legislature authorized the NJRC to license trainers and to adopt regulations and conditions under which licenses are issued. *See* N.J.S.A. 5:5–33. N.J.A.C. 13:71–23.1 makes clear that the purposes of the promulgated rules is "to protect the integrity of horse racing, to guard the health of the horse, and to safeguard the interests of the public and racing participants...." N.J.A.C. 13:71–2.3 per-

mits the penalty of suspension for violation of a regulation. The Board of Judges, the ALJ, and the NJRC found that the trainers violated N.J.A.C. 13:71–23.1 and –23.6. Thereafter they imposed the severe suspensions because of the unknown nature and effect of fernspiride with the stated purpose to protect the integrity of racing from the effects of drug experimentation in addition to protecting the horses and the participants in the races. The Court makes no determination as to the ultimate issues of whether the proceedings and/or the result of the proceedings were constitutionally infirm. The Court has merely provided the above discussion in support of its conclusion that the proceedings were "judicial in nature" and in response to plaintiffs' contention that the proceedings were legislative in nature.

6. In *Patsy, supra,* the available administrative proceeding would have been a remedial action instituted by the plaintiff to redress a perceived wrong instituted by the State, i.e. the alleged denial of employment opportunities on the basis

see also *Alleghany Corp. v. Pomeroy*, 898 F.2d 1314 (8th Cir.1990) (finding *Younger* abstention appropriate where state administrative proceedings were concluded, but appeal to state court existed); *Alleghany Corp. v. Haase*, 896 F.2d 1046, 1053 (7th Cir.1990) (recognizing *Younger* abstention would be appropriate through the conclusion of the state proceedings in situations where federal plaintiff's conduct had exposed him/her to a state enforcement proceeding, but finding that where administrative proceeding was not reflective of a state's effort either administratively or judicially "to bring violators of its laws to book", *Younger* abstention was not warranted), *judgment vacated as moot*, 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991); *Kercado–Melendez v. Aponte–Rogue*, 829 F.2d 255, 258–62 (1st Cir.1987) (recognizing coercive/remedial distinction between *Dayton Christian* and *Patsy*, but finding that where school superintendent initially sought to challenge her dismissal on constitutional grounds through available administrative procedures, she was not precluded under *Younger* from having her § 1983 action heard on the merits in federal court instead of proceeding to the conclusion of the administrative proceeding), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); *but see Thomas v. Texas State Bd. of Medical Examiners*, 807 F.2d 453 (5th Cir.1987) (finding no ongoing state proceeding where administrative proceeding had concluded, even if state court review of constitutional claims is available). For the reasons more fully discussed in *Foot Medicine*, in addition to the extensive discussions on this issue in the above-cited cases, this Court finds that an ongoing judicial proceeding exists for purposes of *Younger* abstention.

The second prerequisite to *Younger* abstention is a finding that important state interests are implicated. There can be no dispute that the regulation of the horse racing industry is an important state interest. As recognized by the New Jersey Appellate Division:

> The danger of clandestine and dishonest activity inherent in the business of horse racing has been well established. The business itself and the legalized gambling which accompanies its activities are strongly affected by a public interest. Corruption in horse racing activities is regarded as an affront to a publicly sponsored sport with the potential of far reaching consequences. Strict and close regulation is therefore regarded as highly appropriate.

*Dare v. State*, 159 N.J.Super. 533, 536–37, 388 A.2d 984 (App.Div.1978). Accordingly, the Court finds that the second prerequisite to *Younger* abstention is satisfied.

The third and final prerequisite is a finding that the federal plaintiffs have an adequate opportunity to raise their constitutional claims in the state court proceeding. As discussed previously, plaintiffs' appeals of the NJRC decision are currently pending before the Appellate Division. In those appeals plaintiffs have raised all of the federal constitutional claims raised in their § 1983 Complaints. State courts are as competent as federal courts in deciding federal constitutional issues. Accordingly, the Court finds that the federal plaintiffs have an adequate opportunity for redress of their constitutional claims before the New Jersey state courts.

A finding that the three prerequisites to *Younger* abstention exist does not end the analysis. The Court must consider whether any of the recognized exceptions to the *Younger* doctrine compel the Court to retain jurisdiction notwithstanding *Younger*. Such

---

of race. Instead of exhausting her available administrative remedies, Patsy filed her § 1983 action in federal court. In addressing the timing of the filing of § 1983 action, the Supreme Court held that litigants need not exhaust their administrative remedies prior to bringing a § 1983 action in federal court. In *Dayton Christian*, *supra*, the Supreme Court recognized that the application of *Younger* abstention to pending state administrative proceedings is fully consistent with *Patsy's* holding where the state pro-

ceedings are "coercive rather remedial, began before any substantial advancement in the federal action took place, and involve an important state interest." 477 U.S. at 627–28 n. 2, 106 S.Ct. at 2722–23 n. 2. Because the pending cases were initiated by the State to enforce state rules rather than by the federal plaintiffs as remedial actions seeking to vindicate their rights, the Court finds that the no-exhaustion rule of *Patsy* is not offended by the Court's decision to abstain.

exceptions include situations where " 'deference to the state proceedings will present a significant and immediate potential for irreparable harm to the federal interests asserted.' " *Olde Discount Corp. v. Tupman*, 1 F.3d 202 (3d Cir.1993) (recognizing irreparable harm exception to *Younger* abstention where conflict existed between state and federal laws such that a decision to abstain in favor of allowing State to proceed in accordance with state law would foreclose plaintiff from his rights established pursuant to federal law), *quoting Ford Motor Co. v. Insurance Commissioner*, 874 F.2d 926, 932 (3d Cir. 1989). In essence, the irreparable harm exception appears to become significant where the decision to abstain would effectively bar plaintiff from an adequate remedy with respect to the federal claims. *See Olde Discount*, 1 F.3d at 212 (citing cases where courts have found irreparable injury); *see also Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (finding *Younger* abstention not appropriate where although state court administrative proceedings were pending, agency was incompetent to adjudicate the issue before it by reason of a pecuniary bias on the part of the members of the committee); *Phillips v. Virginia Bd. of Medicine*, 749 F.Supp. 715, 730 n. 30 (E.D.Va.1990) (noting that where state court appellate review of suspension of medical license is available to remedy the constitutional claims no irreparable injury exists).

In the instant case, the irreparable injury that could obviate the application of *Younger* abstention simply does not exist. This is not a case like *Gibson, supra*, where federal plaintiffs sought the aid of the federal courts in enjoining the state proceeding on grounds that administrative remedies were inadequate because of a preexisting pecuniary bias of the board members. Nor is this a case like *Olde Discount, supra*, where the

court found a decision not to abstain would irreparably injure the federal rights which the federal plaintiffs were seeking to assert. It was only after the state administrative proceedings had concluded that federal plaintiffs in this case sought the aid of this Court in declaring null the suspension orders of the NJRC based upon alleged constitutional infirmities in the administrative process. The federal plaintiffs, however, have an absolute right which they have exercised to appeal the decisions of the NJRC on the basis of such infirmities. There is no reason for this Court to believe that the Appellate Division will not fairly and adequately address those claims. Accordingly, the federal plaintiffs have not been precluded from having their federal claims remedied in accordance with the dictates of the Constitution. Thus, the irreparable injury exception to *Younger* is not implicated.

Finally, plaintiffs have relied extensively on the Supreme Court case of *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) and a recent decision of the Honorable John Lifland, U.S.D.J., in the matter of *LaPoff v. N.J. Racing Commission*, Civil Action No. 92–3504 for the proposition that abstention is inapplicable to the pending cases. The Court will first address the applicability of *Barry v. Barchi, supra.*

As an initial matter, the Court notes that the issue of *Younger* abstention was never addressed in *Barchi*. At the district court level, the State argued that *Pullman*[7] abstention was warranted. In finding that no unsettled questions of state law existed because the New York Court of Appeals had previously upheld the constitutionality of the challenged statute, the district court decided the case on the merits and found various aspects of the statute unconstitutional. The Supreme Court affirmed the district court insofar as the decision not to abstain was concerned. The Supreme Court concluded

---

7. *See Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Third Circuit has identified three prerequisites to *Pullman* abstention:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in the district court;

(2) Amenability of the state law issues to a state court interpretation that would obviate the need for, or substantially narrow, adjudication of federal claims;

(3) Disruption of important state policies through a federal court's erroneous construction of state law.

*Hughes v. Lipscher*, 906 F.2d 961 (3d Cir.1990).

that the language of the statute being unambiguous and not open to the construction urged by the appellants, it was proper for the district court to decide the case on its merits. Because the *Barchi* Court never had the opportunity to discuss the issue of *Younger* abstention and because *Barchi* pre-dated the Supreme Court's extension of *Younger* to administrative proceedings in *Middlesex, supra,* in 1982, *Dayton Christian, supra,* in 1986, and *NOPSI, supra,* in 1989, this Court declines to place support on *Barchi* for the proposition that *Younger* abstention is inapplicable to the instant case.

Furthermore, in *Barchi* the primary issue addressed by the Court involved the timing of the suspension hearing, i.e. the prompt procedural right to review. Without availing himself to the administrative remedies available to him, Barchi brought a § 1983 action in federal court challenging various aspects of the New York statute as unconstitutional. Among other arguments, Barchi challenged the New York statute insofar as it required the suspension of the trainer prior to a full hearing and final determination on the merits. The Supreme Court rejected the contention that the mandatory prehearing suspension violated due process on its face. The Court did conclude, however, that the statute was unconstitutionally applied as to Barchi in that he was not assured a sufficiently timely postsuspension hearing. *Barchi,* 443 U.S. at 63–64, 99 S.Ct. at 2648–49.

The instant cases are factually distinguishable. The federal plaintiffs are not contending that they are facing administrative proceedings that will not provide them due process thus exposing them to irreparable constitutional injury. In *Barchi,* the constitutional right to a prompt hearing would have been lost if Barchi was bound to proceed through the administrative remedies available to him. In the pending cases, the federal plaintiffs have already proceeded through the administrative proceedings. Not content with the results, they now seek relief in federal court claiming that the administrative proceedings were constitutionally infirm. What this Court has concluded is that in a case where a federal plaintiff is essentially a defendant in a state administrative enforcement action, has proceeded through the administrative proceedings which are a part of the enforcement action, and has a right to appeal the results of that action to the state courts, that process is a unitary state judicial proceeding for *Younger* abstention purposes. Accordingly, notions of equity, comity and federalism counsel against a federal court's intervention in such ongoing state proceedings in which strong state interests are implicated and where the federal plaintiffs have a fair and adequate opportunity to have their federal constitutional claims heard.

In *LaPoff v. N.J. Racing Commission,* Civil Action No. 92–3504, Judge Lifland granted a stay of the suspension of trainer LaPoff pending the completion of the administrative proceedings. In that case LaPoff had been suspended for 22 years for allegedly engaging in "misconduct, fraud, forgery and conspiracy." That case too is factually distinguishable from the instant cases. First, a reading of Judge Lifland's opinion in that matter convinces the Court that Judge Lifland, guided by the *Barchi* case, was extremely concerned about certain due process issues raised by LaPoff, including the timing of LaPoff's postsuspension hearing before the OAL. In the pending cases the plaintiffs have been provided a hearing, the administrative proceedings have concluded and the plaintiffs have appealed the results to the Appellate Division.

Second, Judge Lifland appeared to be persuaded by the fact that the charges in that case did not necessarily implicate the strong state and public interests in protecting the integrity of betting and horse racing. In fact Judge Lifland stated, that an "immediate suspension, which would be clearly warranted where there was demonstrated interference with the integrity of the racing process and demonstrated interference with the right of the public to rely upon the information they had in making their wagering decisions, that sort of interference with those kind of integrity don't seem to be a substantial part, if any part, of the determination of the steward and the racing commission." Transcript of Proceedings, Civil Action No. 92–3504, date August 21, 1992 at 53:16–25. The clear

implication of this language is that if the *LaPoff* case had been a case involving the alleged drugging of horses, Judge Lifland would have been less inclined to grant the stay. Accordingly, for the reasons stated, the Court is satisfied that Judge Lifland's decision in *LaPoff* is unsupportive of plaintiffs' position in the cases currently pending before this Court.

Finally, the Court finds it necessary to comment upon one last aspect of this case. Specifically, plaintiffs have twice made applications for stays of the suspension before the New Jersey courts culminating in ultimate denials of the applications by the New Jersey Supreme Court.[8] To now ask this Court to grant the stay applications following the denial of the stay applications by the New Jersey Supreme Court essentially places this Court in the role of an appellate court reviewing the decisions of the New Jersey Supreme Court. Such is inconsistent with the basic theory of *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). In *Rooker*, a state court judgment was entered in favor of Fidelity. The judgment was subsequently affirmed by the State Supreme Court. Instead of moving for relief before the United States Supreme Court, Rooker filed an action in district court alleging that the judgment was obtained in violation of the Fourteenth Amendment rights to due process and equal protection. In affirming the district court's dismissal of the action, the United States Supreme Court stated:

> Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of the character.... To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the district Court is strictly original.

*Id.* at 416, 46 S.Ct. at 150 (citations omitted).

The Court acknowledges that plaintiffs have not requested this Court to review the final decision of the New Jersey Supreme Court on the merits of the Complaints. It is only with respect to the applications for the stays that the New Jersey Supreme Court has ruled. However, in making those applications, plaintiffs placed before the New Jersey courts those same constitutional issues they now raise in this Court as the basis of their stay applications. The New Jersey courts, for whatever reasons, did not find plaintiffs' constitutional arguments sufficiently compelling to grant the stay applications. By asking this Court to now consider those same arguments as a basis for issuing stays of the NJRC's suspension orders in connection with the federal Complaints, plaintiffs are effectively asking this Court to overrule the determinations of the New Jersey Supreme Court. Given this Court's determination that ongoing state judicial proceedings are pending, in which important state interests are implicated, this Court is compelled to deny plaintiffs' applications.

Having found *Younger* abstention to be appropriate on the facts of this case, the Court next turns to the appropriate disposition of plaintiffs' Complaints. "The typical procedure in *Younger* cases ... is to dismiss the complaint once it is found appropriate to abstain." *Williams v. Red Bank Bd. of Ed.*, 662 F.2d 1008, 1022 (3d Cir.1981).[9] However, in *Williams*, the Third Circuit recognized that where a § 1983 complaint seeks relief which cannot be granted in the state court proceeding it is appropriate to retain juris-

---

8. The decisions of the ALJs reveal that defendants Elliott, LaPoff, and Rubin each filed applications for stays of the decision following the rulings of the Board of Judges. *See supra*, Statement of Facts. Additionally, following the first appearance before this Court on February 8, 1994, the plaintiffs' again filed applications for stays of the final decisions of the NJRC pending the appeals to the New Jersey courts. Those applications ultimately were denied by the Supreme Court on March 22, 1994.

9. In *Schall v. Joyce*, 885 F.2d 101, 108 (3d Cir. 1989), the Third Circuit acknowledged that *Williams* was overruled by *Pennzoil v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), to the extent that *Williams* stated that *Younger* abstention would be inappropriate where the pending state proceeding is a privately initiated one. This Court has found no negative subsequent history of *Williams* with regard to its holding that claims for monetary relief that cannot be adjudicated as part of the state court proceeding should be stayed pending resolution of the state court proceeding.

diction over that portion of the complaint pending the completion of the state court proceedings. *Id.* at 1023; *see also Gwynedd Properties,* 970 F.2d at 1204 & n. 14 (recognizing that the "District Court has no discretion to dismiss rather than to stay claims for monetary relief that cannot be redressed in the state proceeding").

In the instant cases, plaintiffs have sought monetary damages against defendant Zanzuccki for his alleged interference in the initial decisions of the Board of Judges. Because such monetary relief is not available to plaintiffs in the state court proceedings, the Court will retain jurisdiction over the claim for monetary damages against defendant Zanzuccki.

Accordingly, for the reasons set forth above, this Court will abstain pursuant to the *Younger* doctrine. Instead of dismissing the federal actions, however, the Court will stay and administratively terminate the federal actions pending final decision by the New Jersey Supreme Court. At such time as the New Jersey Supreme Court decides the federal plaintiffs' appeals, plaintiffs may return to this Court to reopen and litigate their claims for monetary damages.